**FEDERAL ELECTION COMMISSION,**
**Plaintiff,**

v.

**CENTRAL LONG ISLAND TAX RE-**
**FORM IMMEDIATELY COMMITTEE,**
**Edward Cozzette and Tax Reform Im-**
**mediately, Defendants and Defendant-**
**Counterclaimant,**

**and**

**John W. Robbins, Intervenor.**

**No. 796, Docket 79–3014.**

United States Court of Appeals,
Second Circuit.

Submitted Nov. 2, 1979.

Decided Feb. 5, 1980.

William C. Oldaker, Gen. Counsel, Federal Election Commission, Washington, D.C. (Charles N. Steele, Associate Gen. Counsel, Kathleen Imig Perkins, Asst. Gen. Counsel, Miriam Aguiar, Atty., Washington, D.C., of counsel, Jeffrey H. Bowman, on the brief, Federal Election Commission, Washington, D.C.), for plaintiff, Federal Election Commission.

Joel M. Gora, American Civil Liberties Union, New York City (Charles S. Sims, American Civil Liberties Union, New York

City, Arthur Eisenberg, New York Civil Liberties Union, New York City, of counsel), for defendants Central Long Island Tax Reform Immediately Committee and Edward Cozzette.

Julius B. Poppinga, Newark, N.J. (Mary L. Parell, John R. Drosdick, McCarter & English, Newark, N.J., Ellis, Stringfellow, Patton & Leibovitz, New York City, of counsel), for defendant Tax Reform Immediately, and intervenor John W. Robbins.

Stanley T. Kaleczyc, National Chamber Litigation Center, Inc., Washington, D.C. (Judith K. Richmond, H. Richard Mayberry, Chamber of Commerce of the U.S., Washington, D.C., of counsel), for amicus curiae Chamber of Commerce of the United States.

Before KAUFMAN, Chief Judge, and FEINBERG, MANSFIELD, MULLIGAN, OAKES, TIMBERS, VAN GRAAFEILAND, MESKILL, NEWMAN and KEARSE, Circuit Judges.

PER CURIAM:

In this civil enforcement action in the Eastern District of New York brought by the Federal Election Commission (FEC) pursuant to the Federal Election Campaign Act (FECA), 2 U.S.C. §§ 431, *et seq.*, based on alleged violations of certain of the Act's reporting, disclosure and identification requirements, 2 U.S.C. §§ 434(e), 441d,[1] Judge George C. Pratt invoked the Act's extraordinary provision for expedited *en banc* review of constitutional questions, 2 U.S.C. § 437h(a),[2] by certifying to us certain constitutional issues that had been raised by way of defenses and counterclaims. Adopting the procedure used in *Buckley v. Valeo*, 171 U.S.App.D.C. 172, 519 F.2d 817 (D.C. Cir. 1975), *affd. in part, revd. in part*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), we remanded the case to the district court for amplification of the record through findings of fact after an evidentiary hearing, to be followed by certification of the record and questions to us. Having now reviewed the entire record, we remand the case to the district court with directions to dismiss the complaint for the reason that the challenged provisions of FECA are inapplicable to defendants' activities and therefore no justiciable case or controversy

---

1. Title 2 U.S.C. § 434(e) provides, in pertinent part:

   "(e)(1) Every person (other than a political committee or candidate) who makes contributions or independent expenditures expressly advocating the election or defeat of a clearly identified candidate, other than by contribution to a political committee or candidate, in an aggregate amount in excess of $100 during a calendar year shall file with the Commission, on a form prepared by the Commission, a statement containing the information required of a person who makes a contribution in excess of $100 to a candidate or political committee and the information required of a candidate or political committee receiving such a contribution."

   Title 2 U.S.C. § 441d provides:
   "Whenever any person makes an expenditure for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate through any broadcasting station, newspaper, magazine, outdoor advertising facility, direct mailing, or any other type of general public political advertising, such communication—

   (1) if authorized by a candidate, his authorized political committees, or their agents, shall clearly and conspicuously, in accordance with regulations prescribed by the Com-

   mission, state that the communication has been authorized; or
   (2) if not authorized by a candidate, his authorized political committees, or their agents, shall clearly and conspicuously, in accordance with regulations prescribed by the Commission, state that the communication is not authorized by any candidate, and state the name of the person who made or financed the expenditure for the communication, including, in the case of a political committee, the name of any affiliated or connected organization required to be disclosed under section 433(b)(2) of this title."

2. Title 2 U.S.C. § 437h(a) provides:

   "The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President of the United States may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc."

is presented within the meaning of Article III of the Constitution.

On August 1, 1978, FEC, pursuant to 2 U.S.C. §§ 437d(a)(6)[3] and 437g(a)(5),[4] filed a civil complaint in the Eastern District of New York charging that the now-defunct Central Long Island Tax Reform Immediately Committee (CLITRIM), its Chairman, Edward Cozzette, and the National Tax Reform Immediately organization (National TRIM), an unincorporated association, had in October, 1976, published a pamphlet costing over $100 and "expressly advocating the election or defeat of a clearly identified candidate" without complying with the filing requirements of 2 U.S.C. § 434(e) and the disclaimer requirements of 2 U.S.C. § 441d. The FEC sought civil penalties and injunctive relief.[5]

National TRIM filed an answer denying the FEC's claims and counterclaimed for a declaratory judgment pursuant to 28 U.S.C. § 2201 to the effect that the FECA and regulations thereunder were unconstitutional on their face and as applied. CLITRIM and Cozzette, in lieu of answers, filed a motion to dismiss the complaint or for summary judgment. John W. Robbins, Director of National TRIM and a person entitled to vote in presidential elections, filed a motion for leave to intervene pursuant to Fed.R.Civ.P. 24 and 2 U.S.C. § 437h(a) in order to seek the same declaratory relief sought by National TRIM.

By Memorandum Opinion and Order filed January 25, 1979, Judge Pratt, finding that questions as to the constitutionality of the FECA had been raised, (1) stayed further proceedings in the district court, and (2) certified to us the constitutional issues pursuant to 2 U.S.C. § 437h(a), see note 2, *supra*. Robbins' motion to intervene was referred to us because the only claims asserted by him were challenges to the constitutionality of the FECA. The defendants' motion to dismiss or for summary judgment was adjourned pending our action on the constitutional questions. In response to the defendants' motion for reconsideration of the certification order, Judge Pratt, by order dated March 15, 1979, adhered to his original certification order, holding that a justiciable controversy within the meaning of Article III of the Constitution had been presented and that 2 U.S.C. § 437h(a) mandated immediate certification of all constitutional questions to this Court for resolution before any further steps could be taken by the district court in the matter, even though we might then decide to remand the case for development of a factual record, as done in *Buckley v. Valeo, supra*.

■ On March 22, 1979, CLITRIM and Cozzette moved before us to remand the

---

3. Title 2 U.S.C. § 437d(a)(6) provides:

"(a) The Commission has the power—

\*   .   \*     \*     \*     \*     \*

"(6) *to initiate (through civil actions for* injunctive, declaratory, or other appropriate relief), defend (in the case of any civil action brought under section 437g(a)(9) of this title), or appeal any civil action in the name of the Commission for the purpose of enforcing the provisions of this Act and chapter 95 and chapter 96 of Title 26, through its general counsel."

4. Title 2 U.S.C. § 437g(a)(5) provides, in pertinent part:

"(5)(A) If the Commission determines that there is reasonable cause to believe that any person has committed or is about to commit a violation of this Act or of chapter 95 or chapter 96 of Title 26, the Commission shall make every endeavor for a period of not less than 30 days to correct or prevent such violation by informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement with the person involved . . . .

\*     \*     \*     \*     \*     \*

"(B) *If the Commission is unable to correct* or prevent any such violation by such informal methods, the Commission may, if the Commission determines there is probable cause to believe that a violation has occurred or is about to occur, institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order, including a civil penalty which does not exceed the greater of $5,000 or an amount equal to the amount of any contribution or expenditure involved in such violation, in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business."

5. The demand for civil penalties was later dropped pursuant to a stipulation filed May 15, 1979.

case to the district court on the grounds that in an enforcement proceeding under § 437g, as distinguished from a suit for declaratory relief under § 437h, constitutional and other defenses should first be decided by the district court; thus the district court had erred in not first deciding questions of statutory interpretation and jurisdiction that might render unnecessary a constitutional adjudication under § 437h. FEC took the position that § 437h applied, even though the constitutional issues had been raised by a counterclaim for declaratory judgment rather than by institution of a suit for declaratory relief. We agreed with the FEC.

By order dated April 23, 1979, and amended May 2, 1979, we granted leave to Robbins to intervene as a counterclaiming defendant, noted that we appeared to have jurisdiction under 2 U.S.C. § 437h as the record then stood, and remanded the case to the district court to take evidence, make factual findings, and certify to us the record and the constitutional questions for resolution. We thus followed the procedure adopted by the D.C. Circuit in *Buckley v. Valeo, supra,* 171 U.S.App.D.C. at 173, 519 F.2d at 818, and advocated by the Seventh Circuit in its recent decision in *Bread Political Action Committee v. Federal Election Commission,* 591 F.2d 29, 36 (7th Cir. 1979).

After extensive evidentiary hearings Judge Pratt, on August 22, 1979, certified to us a substantial record in the case, including transcripts of testimony, exhibits, and some 83 pages of procedural history, constitutional and statutory questions, and findings of fact. The district court adhered to the view that because of its certification of certain constitutional issues pursuant to 2 U.S.C. § 437h(a) the action was no longer pending before it but was a circuit court case which had been remanded solely for the specific purposes set forth in our order of April 23, 1979, as amended. Hence it did not rule upon the defendants' motions to dismiss or for summary judgment. However, in order to avoid a further remand for rehearing, it thoughtfully provided us with its views on pertinent issues of statutory interpretation, concluding that if it had jur-

isdiction it would hold that the FEC enforcement action was dismissable on the ground that the Fall, 1976, CLITRIM Bulletin which was the subject of the action did not "expressly advocate" the election or defeat of a candidate within the meaning of 2 U.S.C. §§ 434(e) and 441d.

The facts, briefly summarized, are as follows. The John Birch Society, Inc. (Society), a Massachusetts corporation founded in 1958 by Robert Welch, publishes the TRIM (Tax Reform Immediately) Bulletin, a quarterly in which the Society is identified as the publisher. The Society, which is not affiliated with any political party, committee or candidate, primarily serves the educational interests of its followers and not any pecuniary business interest. It is supported by membership dues and voluntary contributions. National TRIM is a committee established by the Society, consisting of a network of local TRIM committees throughout the United States, advocating lower taxes and less government spending. The local TRIM committees are expected to send to TRIM a monthly report on their activities and income, as well as one-half of all dues and donations received.

Since 1975 National TRIM has researched, written and mailed to the local TRIM committees "camera-ready" copy of the quarterly TRIM Bulletin, with instructions for printing. The copy sets forth (1) positions with respect to certain economic and tax issues, (2) the voting records of all members of Congress on specific legislation concerning these issues, along with a characterization of votes as "For Lower Taxes and Less Government" or "For Higher Taxes and More Government," and (3) a commentary reflecting National TRIM's views as to the merits of the bills identified. No mention is made of any particular federal election, the political affiliation of any congressman, the fact that he is or is not a candidate for elective office, or the name or views of any electoral opponent of any congressman. The instructions suggest to the local TRIM committees that they use a photograph of their congressman, since this permits voters to connect him or her with

his or her voting record and aids in "unseating a liberal," "unseating or changing the voting pattern of a 'moderate,'" or "strengthening a conservative" representative.

Armed with this material, numerous local TRIM committees, including CLITRIM, have published and distributed the TRIM Bulletin, tailored to set forth the voting records and characterizations of the votes of their respective local congressmen. Approximately 460,600 Fall, 1976, TRIM Bulletins were published.

In the summer of 1976 defendant Cozzette, a resident of Huntington Station,

Long Island, who has been active with others in advancing views on economic and social issues, formed CLITRIM, a non-profit unincorporated association whose purpose was to inform Long Island residents of the need for lowering taxes through less government. It became affiliated with National TRIM, held meetings at which there were discussions and films shown with respect to the danger of higher taxes, and decided to distribute the TRIM Bulletin.

Using the material received from TRIM, CLITRIM prepared a Fall, 1976, TRIM Bulletin. Two of its four pages set forth the general views of the organizations,[6] identi-

---

6. The front and back pages contained the following statement:

"PUT BIG GOVERNMENT ON A DIET

"Your Uncle Sam is a tax glutton. He's never satisfied with little tax snacks. He wants a banquet—and always at the expense of taxpayers and consumers. To see what his gluttony is doing to you, take a good look at your check stub the next time you get paid. You'll see that Uncle Sam and his cousins—state and local governments—have already gobbled up one-fourth of your earnings.

"But that's only the beginning. Uncle Sam and his cousins are still hungry. They now eat further into your income with hundreds of direct taxes, including those on real estate, automobiles, gasoline, entertainment, food, and clothing. By the time they've finished this meal, they've consumed one-third or more of your earnings.

"Yet Uncle Sam is still not satisfied. But he has a problem. If he keeps eating at the taxpayers' pockets openly, they may revolt. So he turns to *hiding* his excesses. After directly taxing so many of your hard-earned dollars, Uncle Sam now resorts to *hidden taxes*—business regulations, business taxes, and inflation.

"Most persons would never think of these as hidden taxes, but they all eat into your cash just as if you had been taxed directly.

"Here's how these hidden taxes affect your pay: When businesses are hit with regulations or taxes, their costs increase. The businesses have no choice—they must increase prices to pay the higher costs. When the consumer buys a product or service, *the hidden taxes are already included in the price.*

"Only naive or dishonest men advocate shifting the tax burden to businesses in order to reduce individual taxes, because when businesses are taxed, consumers will always pay.

"Inflation is a *hidden* tax increase which is caused by the federal government. When Congress votes to spend money that isn't there, a deficit exists. This eventually causes an increase in the money supply which pushes up demand for goods and services and causes prices to rise. What happens, in effect, is that the consumer pays higher prices as a direct result of federal deficits.

"Remember this: *You* will pay one way or another for every government program—either through direct taxes that you can see, or through hidden taxes that you cannot.

"Nearly half of your earnings are now taken either by direct or hidden taxes. And economists estimate that if taxes continue to rise at present rates, you will see Uncle Sam and his cousins take 54¢ of every hard-earned dollar by 1985. This is not a wild estimate. Taxpayers in many socialist countries already pay 60 percent or more of their incomes to the government.

"The problem is obvious: Uncle Sam has become too fat, too bossy, and too wasteful to be allowed to continue in his tax gluttony. The answer: Put Big Government on a diet; TRIM away the bureaucratic blubber, and reduce the heavy load of taxation.

"Every taxpayer should become an Uncle Sam 'Tax Weightwatcher.' Keep an eye on how your Representative votes on measures which increase your total taxes—both direct and hidden—by using our quarterly *TRIM Bulletin.* If your Representative consistently votes for measures that increase taxes, let him know how you feel. And thank him when he votes for lower taxes and less government.

"As you study your Representative's voting record on the inside, remember that the cost per household shown for each measure is paid by you either directly, or through hidden taxes.

"Keep in mind that we only had space for twenty-five measures, so we picked what we

fied the officers of the Committee, furnished information about the CLITRIM members and invited others to join. The remaining pages reported the voting record of Congressman Jerome A. Ambro, a local representative of central Long Island. These pages included a photograph of Congressman Ambro and a chart of 24 votes cast by him, 21 of which were characterized as for "Higher Taxes and More Government" and 3 as for "Lower Taxes and Less Government." CLITRIM's stand against higher taxes and "Big Government" in favor of lower taxes and "Less Government" was made clear by slogans and commentaries. However, the leaflet did not refer to any federal election, to Congressman Ambro's political affiliation of candidacy, or to any electoral opponent of the Congressman. Some 5,000 to 10,000 copies were handed out at the local railroad station, shopping centers and a public meeting at which Congressman Ambro spoke. The cost of printing was $135. Thereafter leafleting activity ceased and CLITRIM was disbanded. However, several other local TRIM committees have been formed in various parts of the United States and have engaged in similar publicizing of congressmen's votes on economic and tax issues.

The FEC, acting upon verified complaints, has investigated the activities of some of these local committees and instituted at least one other enforcement proceeding, Civil Action No. 78–2025, in the District of New Jersey, filed August 22, 1978.

Following Judge Pratt's certification, the parties briefed for us the pertinent statutory and constitutional issues, the last reply brief being submitted in November, 1979.

## DISCUSSION

The threshold question is whether 2 U.S.C. § 437h(a), see note 2, *supra*, obligates us to resolve the constitutional issues certified to us when the case may, upon the factual record now developed, be dismissed on the ground that the statutes whose con-

---

felt were the most important and timely of the more than 1,000 votes cast since the current session of Congress began.

stitutionality have been challenged by way of defenses and counterclaims do not apply to the activities against which they have been invoked.

██ Although the usual *en banc* jurisdiction vested in us by § 437h(a) is limited to "questions of constitutionality," we do not believe it is so constricted as to preclude our first construing the statutes under constitutional attack to determine whether they apply to the defendants' conduct, as we would normally do, *United States v. Harriss*, 347 U.S. 612, 617–19, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954). Cf. *Hagans v. Lavine*, 415 U.S. 528, 543–45, 94 S.Ct. 1372, 1382–83, 39 L.Ed.2d 577 (1974). For if they do not, the constitutional counterclaims would not present a "case" or "controversy" ripe for adjudication within the meaning of Art. III, Sec. 2, of the Constitution, a constitutional prerequisite to exercise of jurisdiction by federal courts, *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937), and it would be necessary to dismiss the claim. Congress is powerless to vest federal courts with jurisdiction beyond the limits fixed by the Constitution. While the jurisdictional provision of § 437h was intended to provide judicial review to the extent permitted by Article III, *Buckley v. Valeo*, 424 U.S. 1, 11–12, 96 S.Ct. 612, 630–31, 46 L.Ed.2d 659 (1976), it may not go beyond those limits. For this reason the District of Columbia Circuit, sitting *en banc* pursuant to § 437h in *Clark v. Valeo*, 182 U.S.App.D.C. 21, 559 F.2d 642 (D.C. Cir.), *affd.*, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977), returned certified constitutional questions unanswered to the district court with directions to dismiss the action for declaratory and injunctive relief as unripe.

██ Moreover, the basic principle that a federal court should "not anticipate a question of constitutional law in advance of the necessity of deciding it," *Ashwander v. TVA*, 297 U.S. 288, 346, 56 S.Ct. 466, 483, 80

---

"Lastly, never forget that since *you* are paying the tax bills, *you* are the boss. And don't ever let your Representative forget it!"

L.Ed. 688 (1936) (Brandeis, J., concurring), quoting from *Liverpool, N.Y. & P.S.S. Co. v. Emigration Commissioners*, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885), has been strictly followed where, as in the present case, difficult or far-reaching constitutional issues are raised. See, e. g., *New York Transit Authority v. Beazer*, 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979); *Ulster County Court v. Allen*, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979). If a court can decide a case on non-constitutional grounds, it should not stray into the field of constitutional analysis.

▇▇▇▇ Applying these principles here we have no difficulty now that we have a full record, in concluding that 2 U.S.C. §§ 434(e) and 411d do not apply to defendants' conduct. Nor is there any indication that the defendants threaten to engage in any conduct to which these statutes might apply.[7]

Title 2 U.S.C. § 434(e) obligates any "person . . . who makes contributions or independent expenditures *expressly advocating* the election or defeat of a clearly identified candidate" (emphasis supplied) in an amount exceeding $100 in any calendar year, to file with the FEC a statement containing the information required of contributors of more than $100 to a candidate or political committee. Similarly, 2 U.S.C. § 441d requires any person who "makes an expenditure for the purpose of financing communications *expressly advocating* the election or defeat of a clearly identified candidate" (emphasis supplied) through media, advertising or mailing, to state whether the communication is authorized by a candidate, his political committees or agents and, if not, to give the name of the person who financed it.

The language quoted from the statutes was incorporated by Congress in the 1976 FECA amendments, Pub.L. 94–283, title I, 90 Stat. 481, to conform the statute to the Supreme Court's holding in *Buckley v. Valeo, supra*, 424 U.S. at 78–80, 96 S.Ct. at 663–664, that speech not by a candidate or political committee could be regulated only to the extent that the communications "expressly advocate the election or defeat of a clearly identified candidate."[8] Prior to these amendments, the provision had applied to expenditures made "for the purpose of . . . influencing" the election of candidates to federal office. Referring to 18 U.S.C. § 608(e), which had limited the independent political expenditures that any person could make relative to a single candidate and to 2 U.S.C. § 434(e), which required disclosure of such expenditures, the Court stated:

> "We agree that in order to preserve the provision against invalidation on vagueness grounds, § 608(e)(1) must be construed to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office.[52]

> [52] This construction would restrict the application of § 608(e)(1) to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" 424 U.S. at 44, 96 S.Ct. at 646–647.

> "To ensure that the reach of § 434(e) is not impermissibly broad, we construe 'expenditure' for purposes of that section in the same way that we construed the terms of § 608(e)—to reach only funds used for communications that expressly

**7.** Defendant National TRIM and Intervenor, John W. Robbins, seek to challenge the facial constitutionality of §§ 434(e) and 441d, going beyond the claim that those sections are inapplicable to the Fall, 1976, Bulletin. Standing to raise the constitutional claims is alleged on the basis of their desire to publish "documents such as the TRIM Bulletin" and the chilling effect of the statute on their ability to do so. In view of the grounds on which standing is asserted and our conclusion that the challenged portions of FECA do not apply to documents of

the type they wish to publish, we find no case or controversy within the meaning of Article III of the Constitution which would call for us to pass on the facial constitutionality of those sections of the statute.

**8.** While the holding in *Buckley* did not involve § 441d, which was enacted later, the requirement of express advocacy in that section was incorporated in response to *Buckley* at the same time as § 434(e) was amended to add that requirement.

advocate [108] the election or defeat of a

[108] See n. 52, *supra*." 424 U.S. at 80, 96 S.Ct. at 664.

clearly identified candidate. This reading is directed precisely to that spending that is unambiguously related to the campaign of a particular federal candidate.

The Supreme Court made note of the broad protection to be given political expression, including discussion of candidates, and added, quoting the lower court opinion:

"Public discussion of public issues which are also campaign issues readily and often unavoidably draws in candidates and their positions, their voting records and other official conduct. Discussions of those issues, and as well more positive efforts to influence public opinion on them, tend naturally and inexorably to exert some influence on voting at elections." 424 U.S. at 42 n. 50, 96 S.Ct. at 646, n. 50.

See also *United States v. National Committee for Impeachment*, 469 F.2d 1135, 1142 (2d Cir. 1972); *Federal Election Commission v. AFSCME*, 471 F.Supp. 315, 317 (D.D.C. 1979). Public discussion of this type was held to fall beyond the scope of the statute: "As narrowed, § 434(e) . . . does not reach all partisan discussion for it only requires disclosure of those expenditures that expressly advocate a particular election result." 424 U.S. at 80, 96 S.Ct. at 664. This is consistent with the firmly established principle that the right to speak out at election time is one of the most zealously protected under the Constitution. *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271–72, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971); *Mills v. Alabama*, 384 U.S. 214, 218–19, 86 S.Ct. 1434, 1436–37, 16 L.Ed.2d 484 (1966).

The history of §§ 434(e) and 441d thus clearly establish that, contrary to the position of the FEC, the words "expressly advocating" means exactly what they say. The FEC, to support its position, argues that "[t]he TRIM bulletins at issue here were not disseminated for such a limited *purpose*" as merely informing the public about the voting record of a government official. FEC Reply Brief at 4 (emphasis supplied).

Rather, the purpose was to unseat "big spenders." Thus, the FEC would apparently have us read "expressly advocating the election or defeat" to mean for the purpose, express *or implied*, of encouraging election or defeat. This would, by statutory interpretation, nullify the change in the statute ordered in *Buckley v. Valeo* and adopted by Congress in the 1976 amendments. The position is totally meritless.

The CLITRIM Bulletin of Fall, 1976, contains nothing which could rationally be termed express advocacy. The nearest it comes to expressly calling for action of any sort is its exhortation that "[i]f your Representative consistently votes for measures that increase taxes, let him know how you feel. And thank him when he votes for lower taxes and less government." Neither this nor the voting chart calls for anyone's election or defeat. Indeed, a reader of the pamphlet could not find any indication, express or implied, of how TRIM would have him or her vote, without knowing the positions of the incumbent's opponent. There is no reference anywhere in the Bulletin to the congressman's party, to whether he is running for re-election, to the existence of an election or the act of voting in any election; nor is there anything approaching an unambiguous statement in favor of or against the election of Congressman Ambro.

We therefore conclude that 2 U.S.C. §§ 434(e) and 441d do not apply to the pamphlet in question or to any of the similar activities in which the defendants, intervenor, and amici curiae have engaged or indicate that they will engage. We therefore remand the case to the district court with directions to dismiss the complaint.

KAUFMAN, Chief Judge (with whom OAKES, Circuit Judge, joins), concurring:

I concur fully in the opinion of the court, including its refusal to adjudicate constitutional issues unnecessary to its holding. Nevertheless, the insensitivity to First Amendment values displayed by the Federal Election Commission (FEC) in proceeding

against these defendants compels me to add a few words about what I perceive to be the disturbing legacy of the Federal Election Campaign Act (FECA), 2 U.S.C. §§ 431, *et seq.*

The defendants in this case undertook to spend the modest sum of $135 for the purpose of preparing and circulating to their fellow citizens a pamphlet addressed to the issue of tax reform, specifically advocating their belief in the necessity of significant reductions in current taxation levels. Further the pamphlet assessed the legislative record of their congressman on issues implicating taxation and government spending. It is this conduct that the FEC seeks to "enjoin" because the defendants chose not to register their activity with the federal government, 2 U.S.C. § 434(e), or to include in their publication specific information required by the government, *id.* § 441d.

I confess that I find this episode somewhat perverse. It is disturbing because citizens of this nation should not be required to account to this court for engaging in debate of political issues. Indeed, since the days of the infamous Stamp Act, vigorous denunciation of "oppressive" rates of taxation, has enjoyed a long and notable history. Moreover, it is incongruous to compel defendants to convince a court that they have not dared to "expressly advocate" the defeat of a candidate for public office. I had always believed that such advocacy was to be applauded in a representative democracy.

This case has served to reinforce my view that we "must remain profoundly skeptical of government claims that state action affecting expression can survive constitutional objections." *Thomas v. Board of Education,* 607 F.2d 1043, at 1047 (2d Cir. 1979). From this perspective, I continue to believe that campaign "reform" legislation of the sort before us is of doubtful constitutionality. Indeed, before *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court had emphasized that freedom to criticize public officials and oppose or support their continuation in office constitutes the "central meaning" of the First Amendment. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964); *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966). The First Amendment presupposes that *free* expression, without government regulation, is the best method of fostering an informed electorate. Moreover, "if there be any danger that the people cannot evaluate the information and arguments advanced, . . . it is a danger contemplated by the Framers." *First National Bank v. Bellotti,* 435 U.S. 765, 792, 98 S.Ct. 1407, 1424, 55 L.Ed.2d 707 (1978). Thus, courts have consistently struck down not only government attempts to restrain or punish expression, but also government regulation of speech designed to make information available to the public. *See, e. g., Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); *Talley v. California,* 362 U.S. 60, 64, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960).

There are sound justifications for this view. Officials can misuse even the most benign regulation of political expression to harass those who oppose them. Thus, in libel cases, the Court has recognized that, although false speech is not *per se* protected by the First Amendment, the potential for abuse of defamation suits by government officials necessitates that much false expression be immune from punishment. *See New York Times Co. v. Sullivan, supra.* Similarly, under the FECA, any office-holder can file a complaint with the FEC alleging that the Act's requirements have not been met. *See* 2 U.S.C. § 437g. The Commission can then seek to enjoin further violations or to impose civil penalties for the greater of $5000 or the amount of the contested expenditure. *Id.*

If speakers are not granted wide latitude to disseminate information without government interference, they will "steer far wider of the unlawful zone." *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958), thereby depriving citizens of valuable opinions and information. This danger is especially acute

when an official agency of government has been created to scrutinize the content of political expression, for such bureaucracies feed upon speech and almost ineluctably come to view unrestrained expression as a potential "evil" to be tamed, muzzled or sterilized. *United States v. National Committee for Impeachment*, 469 F.2d 1135, 1142 (2d Cir. 1972). Accordingly, it is not completely surprising that the FEC should view the content of defendants' leaflet in a substantially different light than the members of this court.

The possible inevitability of this institutional tendency, however, renders this abuse of power no less disturbing to those who cherish the First Amendment and the unfettered political process it guarantees. *Buckley v. Valeo, supra*, imposed upon the FEC the weighty, if not impossible, obligation to exercise its powers in a manner harmonious with a system of free expression. Our decision today should stand as an admonition to the Commission that, at least in this case, it has failed abysmally to meet this awesome responsibility.