**FEDERAL ELECTION COMMISSION,
Plaintiff-Appellant,**

v.

**Harvey FURGATCH,
Defendant-Appellee.**

No. 85–5524.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 4, 1986.

Decided Jan. 9, 1987.

Richard Bader, Asst. Gen. Counsel, Charles N. Steele, Gen. Counsel, Carol A. Latham, Atty., Federal Election Com'n, Washington, D.C., for plaintiff-appellant.

H. Richard Mayberry, Jr., Jonathan I. Epstein, Stephen M. Griffin, Washington, D.C., for defendant-appellee.

Before GOODWIN and FARRIS, Circuit Judges and SOLOMON,* District Judge.

FARRIS, Circuit Judge:

Under the Federal Election Campaign Act, a political advertisement which "expressly advocates" either the election or defeat of a candidate must be reported to the Federal Election Commission. We must decide whether in this case reporting was required and if so whether the Act meets constitutional demands.

No right of expression is more important to our participatory democracy than political speech. One of the most delicate tasks of First Amendment jurisprudence is to determine the scope of political speech and its permissible regulation. This appeal requires us to resolve the conflict between a citizen's right to speak without burden and society's interest in ensuring a fair and representative forum of debate by identifying the financial sources of particular kinds of speech.

I.

On October 28, 1980, one week prior to the 1980 presidential election, the *New York Times* published a full page advertisement captioned "Don't let him do it," placed and paid for by Harvey Furgatch. The advertisement read:

DON'T LET HIM DO IT.

The President of the United States continues degrading the electoral process and lessening the prestige of the office.

It was evident months ago when his running mate outrageously suggested Ted Kennedy was unpatriotic. The President remained silent.

*And we let him.*

It continued when the President himself accused Ronald Reagan of being unpatriotic.

*And we let him do it again.*

In recent weeks, Carter has tried to buy entire cities, the steel industry, the auto industry, and others with public funds.

*We are letting him do it.*

He continues to cultivate the fears, not the hopes, of the voting public by suggesting the choice is between "peace and war," "black or white," "north or south," and "Jew vs. Christian." His meanness of spirit is divisive and reckless McCarthyism at its worst. And from a man who once asked, "Why Not the Best?"

It is an attempt to hide his own record, or lack of it. If he succeeds the country will be burdened with four more years of incoherencies, ineptness and illusion, as he leaves a legacy of low-level campaigning.

DON'T LET HIM DO IT.

On November 1, 1980, three days before the election, Furgatch placed the same advertisement in *The Boston Globe.* Unlike the first advertisement, which stated that it was paid for by Furgatch and was "[n]ot

* The Honorable Gus Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

authorized by any candidate," the second advertisement omitted the disclaimer. The two advertisements cost Furgatch approximately $25,000.

On March 25, 1983, the Federal Election Commission brought suit against Furgatch under the Federal Election Campaign Act, 2 U.S.C. § 437g(a)(6)(A).[1] The FEC sought a civil penalty and an injunction against further violation of the Act. It alleged that Furgatch violated 2 U.S.C. § 434(c)[2] by failing to report his expenditures and 2 U.S.C. § 441d[3] by failing to include a disclaimer in *The Boston Globe* advertisement. Furgatch moved for dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state a claim. The district court orally granted the motion to dismiss and on December 10, 1984 entered its final order. It concluded that the advertisement was not an "independent expenditure" within the meaning of the statute because it did not "expressly advocate" the defeat of Jimmy Carter.

The court did not rule on the constitutional issues raised by Furgatch.

The FEC timely appealed. This court has jurisdiction under 28 U.S.C. § 1291 and 2 U.S.C. § 437g(a)(9). We review *de novo* a dismissal under rule 12(b)(6). *Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir.1986).

## II.

Individuals who make independent expenditures totalling more than $250 must file a statement with the FEC. 2 U.S.C. § 434(c). The Federal Election Campaign Act defines an "independent expenditure" as "an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate...." 2 U.S.C. § 431(17). The Supreme Court has previously passed upon the constitutionality of the Act's disclosure requirements in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

1. Section 437g(a)(6)(A) provides:
   (6)(A) If the Commission is unable to correct or prevent any violation of this Act or of chapter 95 or chapter 96 of Title 26, by the methods specified in paragraph (4)(A), the Commission may, upon an affirmative vote of 4 of its members, institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order (including an order for a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation) in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business.

2. Section 434(c)(1) requires that any person making an "independent expenditure" greater than $250 file a statement with the FEC. The contents of the statement are specified in 434(c)(2), which provides:
   Statements ... shall include:
   (A) the information required by subsection (b)(6)(B)(iii) of this section, indicating whether the independent expenditure is in support of, or in opposition to, the candidate involved;
   (B) under penalty of perjury, a certification whether or not such independent expenditure is made in cooperation, consultation, or concert, with, or at the request or suggestion of, any candidate or any authorized committee or agent of such candidate; and
   (C) the identification of each person who made a contribution in excess of $200 to the person filing such statement which was made

for the purpose of furthering an independent expenditure.
The term "independent expenditure" is defined as follows in § 431(17):
   (17) The term "independent expenditure" means an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made without cooperation or consultation with any candidate, or any authorized committee or agent of such candidate, and which is not made in concert with, or at the request or suggestion of, any candidate, or any authorized committee or agent of such candidate.

3. Section 441d provides:
   (a) Whenever any person makes an expenditure for the purpose of financing communications expressly advocating the election or defeat of a clearly identified candidate, or solicits any contribution through any broadcasting station, newspaper, magazine, outdoor advertising facility, direct mailing, or any other type of general public political advertising, such communication— .
   \*   \*   \*   \*   \*   \*
   (3) if not authorized by a candidate, an authorized political committee of a candidate, or its agents, shall clearly state the name of the person who paid for the communication and state that the communication is not authorized by any candidate or candidate's committee.

The disclosure provisions for independent expenditures were originally written more broadly, to cover any expenditures made "for the purpose of ... influencing" the nomination or election of candidates for federal office. Reviewing section 434(e) (the forerunner to the provisions before us) in *Buckley*, the Supreme Court held that any restriction on political speech—even restrictions that are far from absolute—can have a chilling effect on speech. "In its effort to be all-inclusive, ... the provision raises serious problems of vagueness, particularly treacherous where, as here, the violation of its terms carries criminal penalties and fear of incurring those sanctions may deter those who seek to exercise protected First Amendment rights." 424 U.S. at 76–77, 96 S.Ct. at 662.

The Court reasoned that Congress may place restrictions on the freedom of expression for legitimate reasons, but that those restrictions must be minimal, and closely tailored to avoid overreaching or vagueness. *Id.* at 78–82, 96 S.Ct. at 663–64. Consequently, the Court was obliged to construe the words of section 434(e) no more broadly than was absolutely necessary to serve the purposes of the Act, to avoid stifling speech that does not fit neatly in the category of election advertising. *Id.* at 78, 96 S.Ct. at 663. The Court was particularly insistent that a clear distinction be made between "issue discussion," which strongly implicates the First Amendment, and the candidate-oriented speech that is the focus of the Campaign Act. *Id.* at 79, 96 S.Ct. at 663.

The Court concluded that the only expenditures covered by the disclosure provisions were funds used for communications that "expressly advocate the election or defeat of a clearly identified candidate." *Id.* It gave examples, in a footnote, of words of express advocacy, including "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," and "reject." *See id.* at 80, n. 108, 96 S.Ct. at 664 n. 108 (incorporating by reference *id.* at 44, n. 52, 96 S.Ct. at 647 n. 52). Congress' later revision of the Act, now before us, directly adopted the "ex-

press advocacy" standard of *Buckley* into sections 431(17) and 441d. *See* H.R.Rep. No. 1057, 94th Cong., 2d Sess. 38 (1976), U.S.Code Cong. & Admin.News 1976, p. 929, reprinted in Legislative History of the Federal Election Campaign Act Amendments of 1976, 1032 (GPO 1977). That standard is designed to limit the coverage of the disclosure provision "precisely to that spending that is unambiguously related to the campaign of a particular federal candidate." *Buckley*, 424 U.S. at 80, 96 S.Ct. at 663.

We must apply sections 434(c) and 441d consistently with the constitutional requirements set out in *Buckley*.

### III.

The FEC argues that Furgatch's advertisement expressly advocates the defeat of Jimmy Carter and therefore is an independent expenditure which must be reported to the FEC. The examples of express advocacy contained in the *Buckley* opinion (i.e., "vote for," "support," etc.), the FEC argues, merely provide guidelines for determining what constitutes "express advocacy." Whether those words are contained in the advertisement is not determinative. The test is whether or not the advertisement contains a message advocating the defeat of a political candidate. Furgatch's advertisement, the FEC contends, contains an unequivocal message that Carter must not "succeed" in "burden[ing]" the country with "four more years" of his allegedly harmful leadership.

The FEC further argues that the advertisement is, in the words of the Supreme Court, "unambiguously related to the campaign of a particular federal candidate." *Buckley*, 424 U.S. at 80, 96 S.Ct. at 663. Nothing more, it contends, is required to place this advertisement under coverage of the Act. The FEC grounds this argument on the Court's effort in *Buckley* to distinguish between speech that pertains only to candidates and their campaigns and speech revolving around political issues in general. The FEC argues that because the adver-

tisement discusses Carter, the candidate, rather than the political issues, Furgatch must report the expenditure.

Furgatch responds that the mere raising of any question on this issue demonstrates that it is not express advocacy. We would not be debating the meaning of the advertisement, he contends, if it were express. He argues that the words "don't let him do it" do not expressly call for Carter's defeat at the polls but an end to his "attempt to hide his own record, or lack of it." The advertisement, according to Furgatch, is merely a warning that Carter will be re-elected if the public allows him to continue to use "low-level campaign tactics."

As the district court noted, whether the advertisement expressly advocates the defeat of Jimmy Carter is a very close call. We have not had occasion to consider the scope of the Act before now. Few other courts of appeals have dealt with the issue.

In *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 769 F.2d 13 (1st Cir.1985), the First Circuit considered an advertisement in which an anti-abortion group published a "Special Election Edition" of its newsletter which contained photographs of candidates identified as "pro-life." The publication included at least two exhortations to "vote pro-life" and the statement: "Your vote in the primary will make the critical difference in electing pro-life candidates." The court ruled that the "Special Election Edition ... explicitly advocated the election of particular candidates in the primary elections and presented photographs of those candidates only," and thus fell within the FEC's regulatory sphere.

In *Federal Election Commission v. Central Long Island Tax Reform Immediately Committee*, 616 F.2d 45 (2d Cir.1980), the Second Circuit addressed the applicability of the statute to a leaflet which expounded the economic views of a tax reform group and criticized the voting record of a local member of Congress, whose picture was included. The leaflet, however, did not refer to any federal election or to the member's political affiliation or opponent. The court held that because the leaflet did not expressly advocate the defeat or election of the congressman, the Act did not apply to the pamphlet. The leaflet "contains nothing which could rationally be termed express advocacy ... there is no reference anywhere in the Bulletin to the congressman's party, to whether he is running for re-election, to the existence of an election or the act of voting in any election; nor is there anything approaching an unambiguous statement in favor of or against the election of Congressman Ambra." *Id.* at 53.

Because of the unique nature of the disputed speech, each case so depends upon its own facts as to be almost *sui generis*, offering limited guidance for subsequent decisions. The decisions of the First and Second Circuits are not especially helpful beyond the general interpretive principles we can find between the lines of those rulings. Neither these decisions nor counsel for the parties here have supplied us with an analysis of the standard to be used or even a thoughtful list of the factors which we might consider in evaluating an "express advocacy" dispute. Without such a framework, the federal courts risk an inconsistent analysis of each case involving the meaning of "express advocacy."

## IV.

As this litigation demonstrates, the "express advocacy" language of *Buckley* and section 431(17) does not draw a bright and unambiguous line. We are called upon to interpret and refine that standard here. Mindful of the Supreme Court's directive that, where First amendment concerns are present, we must construe the words of the regulatory statute precisely and narrowly, only as far as is necessary to further the purposes of the Act, we first examine those purposes in some detail for guidance.

In *Buckley*, the Court described the function of section 434(e) as follows:

Section 434(e) is part of Congress' effort to achieve 'total disclosure' by reaching 'every kind of political activity' in order to insure that the voters are fully in-

formed and to achieve through publicity the maximum deterrence to corruption and undue influence possible. The provision is responsive to the legitimate fear that efforts would be made, as they had been in the past, to avoid the disclosure requirements by routing financial support of candidates through avenues not explicitly covered by the general provisions of the Act.

424 U.S. at 76, 96 S.Ct. at 662.

Thus there are two important goals behind these disclosure provisions. The first, that of keeping the electorate fully informed of the sources of campaign-directed speech and the possible connections between the speaker and individual candidates, derives directly from the primary concern of the First Amendment. The vision of a free and open marketplace of ideas is based on the assumption that the people should be exposed to speech on all sides, so that they may freely evaluate and choose from among competing points of view. One goal of the First Amendment, then, is to ensure that the individual citizen has available all the information necessary to allow him to properly evaluate speech.

Information about the composition of a candidate's constituency, the sources of a candidate's support, and the impact that such financial support may have on the candidate's stand on the issues or future performance may be crucial to the individual's choice from among the several competitors for his vote. The allowance of free expression loses considerable value if expression is only partial. Therefore, disclosure requirements, which may at times inhibit the free speech that is so dearly protected by the First Amendment, are indispensable to the proper and effective exercise of First Amendment rights.

The other major purpose of the disclosure provision is to deter or expose corruption, and therefore to minimize the influence that unaccountable interest groups and individuals can have on elected federal officials. The disclosure requirement is particularly directed at attempts by candidates to circumvent the statutory limits on their own expenditures through close and secretive relationships with apparently "independent" campaign spenders. The Supreme Court noted that efforts had been made in the past to avoid disclosure requirements by the routing of campaign contributions through unregulated independent advertising. Since *Buckley* was decided, such practices have apparently become more widespread in federal elections, and the need for controls more urgent. *See, e.g.,* "The $676,000 Cleanup", *The New Republic,* Vol. 195, No. 22 (December 1, 1986) at 7.

We conclude that the Act's disclosure provisions serve an important Congressional policy and a very strong First Amendment interest. Properly applied, they will have only a "reasonable and minimally restrictive" effect on the exercise of First Amendment rights. *Buckley,* 424 U.S. at 82, 96 S.Ct. at 664. Although we may not place burdens on the freedom of speech beyond what is strictly necessary to further the purposes of the Act, we must be just as careful to ensure that those purposes are fully carried out, that they are not cleverly circumvented, or thwarted by a rigid construction of the terms of the Act. We must read section 434(c) so as to prevent speech that is clearly intended to affect the outcome of a federal election from escaping, either fortuitously or by design, the coverage of the Act. This concern leads us to fashion a more comprehensive approach to the delimitation of "express advocacy," and to reject some of the overly constrictive rules of interpretation that the parties urge for our adoption.

### V.

### A

■ We begin with the proposition that "express advocacy" is not strictly limited to communications using certain key phrases.

The short list of words included in the Supreme Court's opinion in *Buckley* does not exhaust the capacity of the English language to expressly advocate the election or defeat of a candidate. A test requiring the magic words "elect," "support," etc., or their nearly perfect synonyms for a finding of express advocacy would preserve the First Amendment right of unfettered expression only at the expense of eviscerating the Federal Election Campaign Act. "Independent" campaign spenders working on behalf of candidates could remain just beyond the reach of the Act by avoiding certain key words while conveying a message that is unmistakably directed to the election or defeat of a named candidate.

### B

A proper understanding of the speaker's message can best be obtained by considering speech as a whole. Comprehension often requires inferences from the relation of one part of speech to another. The entirety may give a clear impression that is never succinctly stated in a single phrase or sentence. Similarly, a stray comment viewed in isolation may suggest an idea that is only peripheral to the primary purpose of speech as a whole. Furgatch would have us reject intra-textual interpretation and construe each part of speech independently, requiring express advocacy from specific phrases rather than from speech in its entirety.

We reject the suggestion that we isolate each sentence and act as if it bears no relation to its neighbors. This is not to say that we will not examine each sentence in an effort to understand the whole. We only recognize that the whole consists of its parts in relation to each other.

### C

The subjective intent of the speaker cannot alone be determinative. Words derive their meaning from what the speaker intends and what the reader understands. A speaker may expressly advocate regardless of his intention, and our attempts to fathom his mental state would distract us unnecessarily from the speech itself. Interpreting political speech in this context is not the same as interpreting a contract, where subjective intent underlies the formation and construction of the contract and would be the explicit focus of interpretation were it not for the greater reliability of the objective terms. The intent behind political speech is less important than its effect for the purposes of this inquiry. *But see Thomas v. Collins*, 323 U.S. 516, 535, 65 S.Ct. 315, 325, 89 L.Ed. 430 (1945), quoted in *Buckley*, 424 U.S. at 43, 96 S.Ct. at 646.

### D

More problematic than use of "magic words" or inquiry into subjective intent are questions of context. The FEC argues, for example, that this advertisement cannot be construed outside its temporal context, the 1980 presidential election. Furgatch, on the other hand, maintains that the court must find express advocacy in the speech itself, without reference to external circumstances.

The problem of the context of speech goes to the heart of some of the most difficult First Amendment questions. The doctrines of subversive speech, "fighting words," libel, and speech in the workplace and in public fora illustrate that when and where speech takes place can determine its legal significance. In these instances, context is one of the crucial factors making these kinds of speech regulable. First Amendment doctrine has long recognized that words take part of their meaning and effect from the environment in which they are spoken. When the constitutional and statutory standard is "express advocacy," however, the weight that we give to the context of speech declines considerably. Our concern here is with the clarity of the communication rather than its harmful effects. Context remains a consideration, but an ancillary one, peripheral to the words themselves.

We conclude that context is relevant to a determination of express advocacy. A consideration of the context in which speech is

uttered may clarify ideas that are not perfectly articulated, or supply necessary premises that are unexpressed but widely understood by readers or viewers. We should not ignore external factors that contribute to a complete understanding of speech, especially when they are factors that the audience must consider in evaluating the words before it. However, context cannot supply a meaning that is incompatible with, or simply unrelated to, the clear import of the words.

### VI.

■ With these principles in mind, we propose a standard for "express advocacy" that will preserve the efficacy of the Act without treading upon the freedom of political expression. We conclude that speech need not include any of the words listed in *Buckley* to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate. This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is "express" for present purposes if its message is ummistakable and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed "advocacy" if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be "express advocacy of the election or defeat of a clearly identified candidate" when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action.

We emphasize that if any reasonable alternative reading of speech can be suggested, it cannot be express advocacy subject to the Act's disclosure requirements. This is necessary and sufficient to prevent a chill on forms of speech other than the campaign advertising regulated by the Act. At the same time, however, the court is not forced under this standard to ignore the plain meaning of campaign-related speech in a search for certain fixed indicators of "express advocacy."

### VII.

Applying this standard to Furgatch's advertisement, we reject the district court's ruling that it does not expressly advocate the defeat of Jimmy Carter. We have no doubt that the ad asks the public to vote against Carter. It cannot be read in the way that Furgatch suggests.

The bold print of the advertisement pleads: "Don't let him do it." The district court determined that the focus of the inquiry, and the message of the ad, is the meaning of the word "it." Under the district court's analysis, only if "it" is a clear reference to Carter's re-election, supported by the text of the ad, could one find express advocacy. The district court accepted the arguments of Furgatch that "it" may plausibly be read to refer to Carter's degradation of his office, and his manipulation of the campaign process. The ad deplores Carter's "attempt to hide his own record," his "legacy of low-level campaigning," his divisiveness and "meanness of spirit," and his "incoherencies, ineptness, and illusion." As the district court viewed it, although the advertisement criticizes Carter's campaign tactics, it never refers to the election or to voting against Carter. The words "don't let him do it" urge readers to stop Carter from doing those things now and in the future.

We disagree with the district court that the word "it" is the proper focus of the inquiry. There is no question what "it" is—"it" is all the things that the ad accuses Jimmy Carter of doing, the litany of abuses and indiscretions that constitutes the body of the statement. The pivotal question is not what the reader should prevent Jimmy Carter from doing, but what the reader should do to prevent it. The words we focus on are "don't let him." They are simple and direct. "Don't let him" is a command. The words "expressly advocate" action of some kind. If the action

that Furgatch is urging the public to take is a rejection of Carter at the polls, this advertisement is covered by the Campaign Act.

■ In Furgatch's advertisement we are presented with an express call to action, but no express indication of what action is appropriate. We hold, however, that this failure to state with specificity the action required does not remove political speech from the coverage of the Campaign Act when it is clearly the kind of advocacy of the defeat of an identified candidate that Congress intended to regulate.

■ Reasonable minds could not dispute that Furgatch's advertisement urged readers to vote against Jimmy Carter. This was the only action open to those who would not "let him do it." The reader could not sue President Carter for his indelicate remarks, or arrest him for his transgressions. If Furgatch had been seeking impeachment, or some form of judicial or administrative action against Carter, his plea would have been to a different audience, in a different forum. If Jimmy Carter was degrading his office, as Furgatch claimed, the audience to whom the ad was directed must vote him out of that office. If Jimmy Carter was attempting to buy the election, or to win it by "hid[ing] his own record, or lack of it," as Furgatch suggested, the only way to not let him do it was to give the election to someone else. Although the ad may be evasively written, its meaning is clear.

Our conclusion is reinforced by consideration of the timing of the ad. The ad is bold in calling for action, but fails to state expressly the precise action called for, leaving an obvious blank that the reader is compelled to fill in. It refers repeatedly to the election campaign and Carter's campaign tactics. Timing the appearance of the advertisement less than a week before the election left no doubt of the action proposed.

Finally, this advertisement was not issue-oriented speech of the sort that the Supreme Court was careful to distinguish in

*Buckley,* and the Second Circuit found to be excluded from the coverage of the Act in *Central Long Island Tax Reform.* The ad directly attacks a candidate, not because of any stand on the issues of the election, but for his personal qualities and alleged improprieties in the handling of his campaign. It is the type of advertising that the Act was intended to cover.

There is vagueness in Furgatch's message, but no ambiguity. Furgatch was obligated to file the statement and make the disclosures required for any "independent expenditure" under the Federal Election Campaign Act. He is liable for the omission.

We do not address Furgatch's constitutional claims except to note that the constitutionality of the provisions at issue was reviewed in *Buckley,* and the standard set forth by the Supreme Court in that case was incorporated in the Act in its present form. Treatment of those constitutional issues is implicit in our disposition of the statutory question.

REVERSED.