**FEDERAL ELECTION COMMISSION, Plaintiff,**

v.

**NATIONAL ORGANIZATION FOR WOMEN, Defendant.**

**Civ. A. No. 87–2269.**

United States District Court, District of Columbia.

May 11, 1989.

Lisa E. Klein, Office of the Gen. Counsel, and Lawrence M. Noble and Ivan Rivera, Federal Election Com'n, Washington, D.C., for plaintiff.

Lena S. Zezulin, Thomas Hart & Associate, Washington, D.C., for defendant.

## MEMORANDUM OPINION

AUBREY E. ROBINSON, Jr., Chief Judge:

At issue in this case is political speech, which lies at the core of the First Amendment. Discussion of public issues and the qualifications of candidates for public office is integral to a system of government in which the people elect their leaders. In order to make informed choices about its leaders, the citizenry needs to hear the free exchange of ideas. The First Amendment affords the broadest protection to such political expression.

When a group spends money advocating its political opinions, the First Amendment is implicated. As Justice Potter Stewart once stated, "Money is speech and speech is money." *Buckley v. Valeo*, oral argument transcript at 24 (November 10, 1975). Laws restricting the amount of money indi-

viduals or organizations can contribute to an election "necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration and the size of the audience reached." *Buckley v. Valeo*, 424 U.S. 1, 19, 96 S.Ct. 612, 634, 46 L.Ed.2d 659 (1976). Even so, Congress has legislated a complex body of laws monitoring campaign spending so that those with aggregated wealth do not have unfair advantages in the political marketplace. The Supreme Court has upheld the constitutional validity of these restrictions on political speech only where the burden is justified by a compelling state interest.

The plaintiff in this case, the Federal Election Commission ("FEC" or "Commission"), administers the Federal Election Campaign Act ("FECA" or "Act") and seeks to prevent the violation of federal election laws. In bringing this action, the FEC charged that the National Organization for Women ("NOW") illegally used its corporate funds in connection with the 1984 elections. NOW does not contest that it spent corporate funds, but maintains that the sole purpose of the mailing was to make NOW's views known and gain additional members.

NOW's use of corporate funds to finance letters criticizing certain politicians who do not share NOW's political opinions does not fall within the prohibitions of the federal election campaign laws. The Court holds that NOW did not violate FECA when it used its corporate treasury to engage in issue advocacy rather than the express advocacy of the election of specific candidates. NOW was exercising its constitutional right of advocating and defending points of view. It was not spending its money to influence any election or to call for the election or defeat of particular persons seeking political office.

## I. BACKGROUND

On August 14, 1987, the Federal Election Commission filed this action [1] against the

---

**1.** The National Conservative Political Action Committee ("NCPAC") filed the original complaint against NOW at the agency level in October 1984. After investigating NCPAC's charges

National Organization for Women under the Federal Election Campaign Act, 2 U.S.C. § 437g(a)(6)(A).[2] The FEC sought a civil penalty and an injunction against further violations of the Act. It alleged that NOW violated 2 U.S.C. § 441b(a) by using corporate treasury funds to make an expenditure "in connection with" a federal election. Under § 441b, any expenditure for such purpose must be financed by voluntary contributions to a separate segregated fund. In its complaint, the FEC alleges that during the 1984 election cycle, NOW used corporate money to pay for three letters sent to the general public which contained "electioneering messages." According to NOW, these letters were aimed solely at soliciting new members by setting forth the group's political goals.

After engaging in substantial discovery for more than a year, counsel for the parties filed cross-motions for summary judgment which became ripe in January 1989. Oral argument on these motions was heard by the Court at a hearing held on April 19, 1989. The legal memoranda, supporting exhibits, answers to interrogatories, documents, admissions, and the final arguments of counsel have all been fully considered. For the reasons set forth below, the Court grants defendant's motion for summary judgment and denies plaintiff's cross motion.

## II. FINDINGS OF FACT

### A. THE NATIONAL ORGANIZATION OF WOMEN

NOW was established in 1966 as a nonprofit membership organization. It has affiliated organizations in the 50 states and the District of Columbia, as well as nearly 800 local chapters, all organized for the same purpose:

> NOW's purpose is to take action to bring women into full participation in the mainstream of American society now, exercising all the privileges and responsibilities thereof in truly equal partnership with men.

NOW's Bylaws, Article II, Pltf.'s Ex. # 10; Deft.'s Ex. # 5.

Hoping to have a greater effect on political, social, and economic reform in America, NOW entered the political arena as an independent, non-aligned group. Because it recognized the political aspects of its goal of achieving equality for women through participation in the selection of candidates and political decision-making, NOW established two separate segregated funds. These funds, more commonly known as political action committees or "PACs," make expenditures and contributions to influence the outcome of state elections (NOW's Equality PAC) and federal elections (NOW PAC). In compliance with FECA, the two PACs operate entirely separate from NOW and are recognized as legally separate entities.

NOW's membership is restricted to natural persons, or individuals. In 1983 and 1984, respectively, NOW had 216,500 and 165,920 dues-paying members. Deft.'s Response to Interrogatory # 1 (Nov. 16, 1987). During those years, it received 59% of its income from membership dues. Affidavit of Eleanor Smeal at ¶ 6 (Nov. 17, 1988) ("Affid."). The remainder of NOW's income came from membership contributions or from other individuals' contributions. It is estimated that less than 1% of NOW's overall budget comes from contri-

that 12 letters sent out by NOW violated the federal election laws, the FEC concluded that only three letters contained possible violations. In September 1986, the Commission found probable cause to believe NOW had violated § 441b. Because conciliation with NOW was unsuccessful, the Commission was authorized to file this lawsuit under § 437g(a)(6)(A).

**2.** Section 437g(a)(6)(A) provides:
> If the Commission is unable to correct or prevent any violation of this Act ... [it] may

... institute a civil action for relief, including a permanent or temporary injunction, restraining order, or any other appropriate order (including an order for a civil penalty which does not exceed the greater of $5,000 or an amount equal to any contribution or expenditure involved in such violation) in the district court of the United States for the district in which the person against whom such action is brought is found, resides, or transacts business.

butions from corporations or labor unions. *Id.* at ¶¶ 5.

## B. NOW'S DIRECT MAIL CAMPAIGNS

Like numerous other membership organizations, NOW regularly sends letters to the general public, asking people to join their group and support their cause. The established way to attract members is to use a "direct mail campaign." Direct mail became extremely popular in the 1980s as a way for groups of all political persuasions to increase their membership rolls. Groups contract with direct mail firms to send out broad appeals in hopes of attracting enough contributions to pay for the mailing and expand their mailing and membership lists. Direct mail campaigns have less to do with getting action than with getting members.

For the past ten years, NOW has retained the services of a leading direct mail consultant, Roger Craver. Affid. of Craver at ¶¶ 1–2 (Nov. 10, 1988). His firm, Craver, Mathews, Smith & Company ("CMS") obtains lists of names from a broker which are used for NOW's membership solicitation mailings. These names are called "cold prospects." The names and addresses are kept confidential, and NOW has no idea whose names appear on the list or where the recipients reside. *Id.* at ¶ 6. In fact, NOW never sees the mailing list. The entire mailing is planned and orchestrated by CMS and the actual task of mailing the letters is done by an outside mailing house. *Id.* at ¶ 8.

## C. THE THREE CONTESTED MAILINGS

In 1983 and 1984, NOW's president Judy Goldsmith, and her assistant, Lillian Ciarrochi, met with consultant Roger Craver, regarding the organization's direct mail activities. Deposition of Judy Goldsmith at 50, 63 (June 1, 1988). After these meetings, Craver drafted the text of three membership solicitation letters which are the subject of this action. Affid. of Craver at ¶ 5. Two of the letters were quite successful in gaining new members for NOW. There is no dispute that all costs for the prepara-

tion, printing, and distribution of these mailings were paid from the organization's general corporate treasury funds.

### 1. *The "59¢ Letter"*

The first disputed mailing, also referred to as the "59¢ letter" addresses the subject of economic discrimination against women. The letter urges the recipient to join NOW and to wear a 59¢ button as a symbol of the fact that women earn 59¢ for every dollar earned by men. While the letter focuses on issues (wage discrimination, Social Security, divorce law, education), it also criticizes political leaders for their adverse positions or lack of attention to these issues.

Three sentences in the four-page "59¢ letter" are critical of public officials:

And now the Reagan Administration is threatening to make a dangerous situation even worse....

A bad economy, coupled with an antagonistic Administration in Washington, poses an immediate and real threat to the economic rights of women everywhere....

....

The New Right, the Reagan Administration, and the Republican Party all thought that "the ladies" would go away after the ERA deadline expired. *Were they ever wrong!*

Pltf.'s Ex. # 3 at 2, 3–4; Deft.'s Ex. # 1 at 2, 3–4 (emphasis in the original).

In its motion for summary judgment, the FEC highlights the following sentence as offensive: "Politicians listen when they think an organized group of citizens can help elect or defeat them." *Id.* at 3. The Commission does not quote any other part of this letter which it finds violative of the FECA. Instead, it argues that the letter as a whole contains "blatant electioneering" messages in connection with the 1984 federal election.

The letter does discuss voting for or against politicians as one method of fighting the unequal treatment of women. The "59¢ letter" lists its three-pronged attack as being legal, economic, and political. Un-

der the political heading, the letter discusses NOW's political action committees' capacity to raise money "to defend our friends and defeat those who oppose women's rights." *Id.* The letter never mentions who those friends or enemies may be, nor does it urge the reader to vote in a particular way. The "59¢ letter" describes what NOW does, and encourages the recipient to give NOW financial and moral support to help end sexual discrimination.

### 2. The "Abortion Letter"

The second letter at issue seeks "immediate help for the *Reproductive Rights Campaign* of the *National Organization for Women.*" Pltf.'s Ex. # 2 at 1; Deft.'s Ex. # 2 at 1 (emphasis in the original). This mailing, the "abortion letter," asks the recipient to support reproductive freedom and defend abortion rights by joining NOW. Unlike the "59¢ letter," this one specifically mentions a few prominent opponents of abortion:

> If Jesse Helms, Orrin Hatch, Strom Thurmond, and other New Right Senators in control of key committees attempt to force their anti-abortion legislation through Congress, our side must be prepared to let Congress know—*particularly newly elected representatives—that we are well-organized and prepared to defend the right to a safe, legal abortion.*

*Id.* at 2 (emphasis in the original). Of those Senators mentioned, only Helms and Thurmond were up for re-election in 1984.

The letter also broadly criticized politicians who oppose abortion rights:

> In Congress ... the New Right is still working on legislation that would outlaw *all* abortions. In the last Congress, the notorious Helms and Hatch Amendments came within *one* vote of passing the U.S. Senate. *Never before had anti-abortion legislation come so far.*

*Id.* at 1 (emphasis in the original).

The FEC contends that NOW's reference to a "renewed effort now being launched by New Right reactionary groups in preparation for the 1984 elections" violates federal election campaign laws. *Id.* at 2. The

Commission also objects to the letter's appeal to "begin right now to take the steps necessary to defend our right to abortion in the new Congress ... in the states ... and at the ballot box." *Id.*

### 3. The "ERA Letter"

A third letter makes the case for the Equal Rights Amendment ("ERA") and urges recipients to petition their Senators to support such an amendment to the Constitution. The mailing mentions politicians who have opposed ERA:

> We expect our greatest difficulty in getting the ERA through a Senate now controlled by the likes of Jesse Helms, Orrin Hatch, Strom Thurmond, John East, and others of the reactionary New Right.
>
> AND ... the resistance in the Senate will be fueled by Ronald Reagan, who still adamantly opposes any Equal Rights Amendment.
>
> . . . .
>
> Jesse Helms, Strom Thurmond, and the 17 other Republican senators up for reelection in 1984 must be made to understand that failure to pass the ERA will result in powerful campaigns to defeat them.

Pltf.'s Ex. # 1 at 2–3; Deft.'s Ex. 3 at 2–3 (emphasis in the original).

The FEC focuses on different sentences in the "ERA letter," claiming that they exhort the reader to take immediate action. According to the Commission, the following sentences attempt to pressure politicians:

> ... as the November elections loom closer ... members of Congress think about the power of the Gender Gap.
>
> . . . .
>
> If the Senate and the Republican Party fail to heed the message of 1982 and reject the ERA, they will face a gender gap in the 1984 elections that will have turned into a "gender gulf." We will see to that.
>
> . . . .
>
> Politicians listen best when they know that an organized force has the numbers and the clout to defeat or elect them.

*Id.* at 1, 3.

Whether the above excerpts from the three letters at issue violate the prohibitions of the FECA is a question of law for this Court to determine by analyzing the federal election laws and the cases that have applied them.

## III.  LEGAL ANALYSIS

### A.  SECTION 441b(a) OF FECA

Section 441b(a) of the Federal Election Campaign Act provides that "[i]t is unlawful for ... any corporation ... to make a contribution or expenditure in connection with any election to any political office...." 2 U.S.C. § 441b(a). Under § 441b, any expenditure for such purpose must be financed by voluntary contributions to a separate segregated fund. Section 441b(b)(2) defines "contribution or expenditure" as the provision of things of value "to any candidate, campaign committee, or political party or organization, in connection with any election...."

The Supreme Court has recently reviewed the legislative history of § 441b to determine the scope of the term "expenditure." In *Federal Election Commission v. Massachusetts Citizens for Life*, 479 U.S. 238, 245–46, 107 S.Ct. 616, 621–22, 93 L.Ed.2d 539 (1986) ("MCFL"), the Court pointed out that the "general definitions section of the Act contains a broader definition of 'expenditure,' including within that term the provision of anything of value made *'for the purpose of influencing* any election for Federal office....'" 2 U.S.C. § 431(9)(A)(i) (emphasis added by the Court). In so doing, the Supreme Court resolved a prior conflict between the courts and the FEC over whether "in connection with" superceded § 431's language, "for the purpose of influencing." The Court reviewed Congress's intent that corporate funds should not be used to influence the public at large to vote for a particular candidate or for a particular party. *Id.* at 247, 107 S.Ct. at 622 (citing *United States v. Automobile Workers*, 352 U.S. 567, 589, 77 S.Ct. 529, 540, 1 L.Ed.2d 563 (1957)). It is now clear that "in connection with" denotes a general class of payments that are prohibited if made with the intent to influence a federal election.

### B.  EXPRESS ADVOCACY REQUIRED

In upholding FECA's clear prohibition of corporate expenditures made "in connection with an election," the Supreme Court specifically stated that such "an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of § 441b." *MCFL*, 479 U.S. at 249, 107 S.Ct. at 623. The Court adopted the "express advocacy" requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons. As the Ninth Circuit recently stated, "[t]he Court was particularly insistent that a clear distinction be made between 'issue discussion,' which strongly implicates the First Amendment, and the candidate-oriented speech that is the focus of the Campaign Act." *Federal Election Commission v. Furgatch*, 807 F.2d 857, 860 (9th Cir.1987) (citing *Buckley*, 424 U.S. at 79, 96 S.Ct. at 663).

From *Buckley* through *MCFL*, it is clear that the standard "in connection with an election" is not distinct from "express advocacy." In *MCFL*, the Supreme Court applied the same standard of "express advocacy" to the term "in connection with an election." 479 U.S. at 248–49, 107 S.Ct. at 622–623. Judicial authority clearly supports the interpretation that only communications which contain explicit electoral messages can be prohibited by § 441b.

"Express advocacy" as defined by the Court in *Buckley* and reiterated in *MCFL*, consists of words or expressions of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," or "reject." *Buckley*, 424 U.S. at 44 n. 52, 96 S.Ct. at 647 n. 52. *See also, MCFL*, 479 U.S. at 249, 107 S.Ct. at 623; 11 C.F.R. § 109.1(b)(2). An explicit and unambiguous reference to the candidate must be mentioned in the communication in order for express advocacy to be present. In *Buckley*, the Court agreed that funds spent to propagate one's views on issues without expressly calling for the election or

defeat of a clearly identified candidate are not covered by FECA. 424 U.S. at 43–44, 96 S.Ct. at 646–647.

When the FEC attempted to convince the Second Circuit that the Act prohibited both express and implied advocacy of the election or defeat of political candidates, the court flatly refused. In *Federal Election Commission v. Central Long Island Tax Reform Immediately,* 616 F.2d 45 (2d Cir. 1980), the court of appeals reviewed a leaflet which expounded the economic views of a tax reform group and criticized the voting record of a local member of Congress, whose picture was included. The leaflet did not refer to any federal election, nor to the member's political affiliation or opponent. The nearest the leaflet came to expressly calling for action was in its exhortation to "let him [the congressman] know how you feel. And thank him when he votes for lower taxes and less government." *Id.* at 53. The Second Circuit concluded that the pamphlet contained nothing which could rationally be termed express advocacy. "There is no reference anywhere in the Bulletin to the congressman's party, to whether he is running for re-election, to the existence of an election or the act of voting in any election; nor is there ... an unambiguous statement in favor of or against the election of Congressman Ambro." *Id.* The court held that because the leaflet did not expressly advocate the defeat or election of the congressman, the Act did not apply to it.

Further support for the position that the candidate must be clearly identified and that the voter's action must be specified comes from the Commission itself. In *Matter Under Review 1723,* (Aug. 15, 1984) ("MUR"), the FEC reviewed a non-profit corporation's media campaign to expose the power of PACs in political financing. The General Counsel concluded that because the campaign was non-partisan, made no reference to specific candidates and did not solicit contributions, it was not "for the purpose of influencing" or "in connection with" a federal election.

The words listed in *Buckley* are not the only ones which will be deemed express advocacy. In *Furgatch,* the Ninth Circuit

held that express advocacy is not strictly limited to communications using certain key phrases. "The short list of words included in the Supreme Court's opinion in *Buckley* does not exhaust the capacity of the English language to expressly advocate the election or defeat of a candidate." *Furgatch,* 807 F.2d at 863. The court of appeals proposed a standard for express advocacy: that speech, when read as a whole and with limited reference to external events, may only be interpreted as an exhortation to vote for or against a specific candidate.

> This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is 'express' for present purposes if its message is unmistakable [sic] and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed 'advocacy' if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated.

*Id.* at 864. The panel emphasized that "if any reasonable alternative reading of speech can be suggested, it cannot be express advocacy...." *Id.*

## C. NOW'S LETTERS DO NOT CONTAIN EXPRESS ADVOCACY

NOW's letters do not contain pointed exhortations to vote for or against particular persons. The three mailings include no explicit words directing the reader how to vote. Except for a few passing references to four well-known opponents of ERA and abortion, only two of whom were seeking re-election in 1984, there are no names, photographs, drawings or other unambiguous references to the identity of particular candidates.

Under *Furgatch's* broad test of whether speech constitutes express advocacy, the central message of all three letters was to expand the organization. The mailings were part of a member solicitation drive, akin to the normal business activity of a press entity sending out a letter soliciting subscriptions. *See FEC v. Phillips Publishing Inc.,* 517 F.Supp. 1308 (D.D.C. 1981). In the past, the FEC has upheld

solicitation mailers as constituting mere issue advocacy. *See MUR 1812* (Dec. 18, 1984).

Further implementation of *Furgatch* necessarily involves the "reasonable minds could differ" test. 807 F.2d 864–65. Reasonable minds could certainly dispute what NOW's letters urged the readers to do. The letters make numerous appeals: Join NOW, wear the 59¢ button, tell people that "you've decided to take action for women's equality," raise the nation's consciousness, help NOW's Reproductive Rights Campaign, support the efforts of NOW's political action committees, write a check for $25 (NOW's membership dues), speak out, sign an ERA petition, and put pressure on the Senate and the President. The letters call for action, but they fail to expressly tell the reader to go to the polls and vote against particular candidates in the 1984 election. Because the letters are suggestive of several plausible meanings, because there are numerous pleas for action, and because the types of action are varied and not entirely clear, NOW's letters fail the express advocacy test proposed by the Ninth Circuit in *Furgatch*.

This Court holds that the "59¢ letter," the "abortion letter," and the "ERA letter" can all be regarded as discussions of public issues that by their nature invoke the names of certain politicians. They do not provide explicit directives to vote against these politicians. Moreover, since NOW had no idea where the mailing would be distributed, it clearly lacked the intent to influence any statewide elections. A tiny percentage of the letters ended up reaching the states of those two candidates whose names were actually mentioned. If NOW had intended to seek the defeat of Senators Thurmond and Helms, it would have directed thousands of express letters to people in South Carolina and North Carolina, urging them to vote against these candidates.

Because the letters do not go beyond issue discussion to express electoral advocacy, the use of corporate funds to finance them does not violate federal election laws. NOW was merely attempting to make its views known and gain some new dues-paying members.

This Court holds that the use of corporate funds for NOW's three mailings did submit the expenditure to the restrictions on independent spending found in § 441b. The letters did not violate the statute, however, because they contained only issue advocacy, not express advocacy. Having found that NOW did not violate § 441b of FECA, this Court is not required to determine whether the statute is constitutional as applied to the National Organization of Women.[3]

## IV. CONCLUSION

The three membership solicitation letters mailed by NOW do not fall within § 441b because they do not represent express advocacy of the election of particular candidates. By spending its corporate funds to advocate issues and criticize political opponents, NOW produced speech broadly protected by the First Amendment. NOW engaged in the discussion of governmental affairs which by its nature includes discussions of the people who conduct those affairs. The organization's solicitation letters contained strong sentiments and dramatic statements, but this only reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

Because its actions did not violate 2 U.S.C. § 441b, summary judgment will be entered for the defendant.

---

**3.** In *MCFL*, the Supreme Court first found that the nonprofit organization's "Special Edition" exhorting readers to vote prolife in the upcoming primary election came under the restrictions of § 441b. The Court next found that in order for the expenditure to be subject to § 441b, the expenditure must constitute "express advocacy." After making these two assessments, the Court then determined that § 441b's restriction of independent spending was unconstitutional as applied to that particular nonprofit organization. 479 U.S. at 256–65, 107 S.Ct. at 627–31.