CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, Plaintiff,

v.

Michael MOORE, Attorney General, State of Mississippi, Eric Clark, Secretary of State, State of Mississippi Defendants

No. 3:00CV778WS.

United States District Court, S.D. Mississippi, Jackson Division.

Nov. 2, 2000.

748

Michael B. Wallace, Christopher R. Green, Phelps Dunbar, Jackson, Jan Witold Baran, Wiley, Rein & Fielding, Bobby R. Burchfield, Covington & Burling, Washington, DC, for Chamber of Commerce of the United States of America, plaintiffs.

Eugene Carroll Stone, III, T. Hunt Cole, Jr., Harold Edward Pizzetta, III, Office of the Attorney General, Jackson, for Mike Moore, Attorney General, State of Mississippi, Eric Clark, Secretary of State, State of Mississippi, defendants.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before the court is plaintiff's Motion for Expedited Declaratory Relief under Title 28 U.S.C. §§ 2201[1] and 2202[2]. By its motion, plaintiff Chamber of Commerce of the United States of America (hereinafter "Chamber") asks this court to declare that it may televise certain political advertisements favoring specific candidates for the popularly elected Mississippi Supreme Court without being subjected to Mississippi's law pertaining to election contributions and reporting. To be answerable under Mississippi's laws, says the Cham-

---

1. Title 28 U.S.C. § 2201 provides:

(a) In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(10) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

2. Title 28 U.S.C. § 2202 provides:

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

ber, the independent expenditure by a third party must expressly advocate the election or defeat of a clearly identified candidate without cooperation or consultation with any candidate or any authorized committee or agent of such candidate, and which is not made in concert with or at the request or suggestion of any candidate or any authorized committee or agent of such candidate. According to the Chamber, their advertisements discuss issues of public interest; have not been coordinated with any particular candidates; and do not advocate for the election of any candidate. Thus, says the Chamber, if subjected to Mississippi's contribution limits and reporting requirements, it will suffer a severe impairment of its free speech rights under the First Amendment of the United States Constitution.[3]

The Attorney General and the Secretary of State of the State of Mississippi (hereinafter "the State of Mississippi"),

defendants in this cause, are opposed to plaintiff's requested declaratory relief. Admitting that they have no proof whatsoever of any collaboration between the Chamber and the candidates involved in the advertisements, the defendants contend that plaintiff's advertisements cross the boundary of issue advocacy into the arena of election advocacy and, thus, expressly advocate the election of the favored candidates for the four Mississippi Supreme Court seats.

This court's jurisdiction over this matter is asserted under Title 28 U.S.C. §§ 1331[4], 1334[5] and Title 42 U.S.C. § 1983[6].

## I. BACKGROUND

The State of Mississippi is currently in election season. In addition to the national election for President of the United States and members of Congress, Mississippi is also occupied with electing four members of its Supreme Court. Com-

---

**3.** The First Amendment of the United States Constitution provides that, "[c]ongress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; *or abridging the freedom of speech,* or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**4.** Title 28 U.S.C. § 1331 states: The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**5.** Title 28 U.S.C. § 1334 states in part: (a) Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.
(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.
(c)(1) Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or

respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**6.** Title 42 U.S.C.A. § 1983 provides that, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

prised of nine Justices who hail from three separate districts, the Mississippi Supreme Court, a popularly elected body, is the highest court in the State, standing in review of decisions rendered in the lower County, Circuit, Chancery, and Appeals Courts, themselves staffed by judges who are popularly elected. Except in event of a vacancy when the Governor of the State is empowered to appoint the office-holder, the members of the Mississippi Supreme Court are popularly elected by the citizenry of the respective districts and serve a term of eight years before having again to test the public's confidence at the polls. Although the contenders for the Mississippi Supreme Court are not allowed to run for the office on political party labels [7], the contenders, as any other office-seekers, strive to raise campaign funds, acquire television and radio appearances and post election signs. Predictably, the candidates, whether incumbent or challenger, run on their qualifications, accomplishments and experience. And, since elections for Mississippi Supreme Court Justices, in character and procedure, are alike any other State election, these elections, too, are covered by Mississippi's election disclosure and reporting laws found at Mississippi Code Annotated §§ 23–15–801, et seq.

On October 17, 2000 the United States Chamber of Commerce, a nonprofit corporation residing in the District of Columbia, began televising four advertisements in Mississippi which comment on the backgrounds and qualifications of four candidates for the Mississippi Supreme Court—incumbent Chief Justice Lenore Prather, Justices Jim Smith and Kay Cobb, and candidate Judge Keith Starrett. According to the Chamber, these advertisements do not fall within the embrace of Mississippi's election disclaimer and reporting laws because these advertisements do not advocate for the election or defeat, of these, or any candidates.

State Attorney General Mike Moore and Secretary of State Eric Clark disagree, contending further that these advertisements constitute "independent expenditures" subject to the reporting requirements of Mississippi Code Annotated §§ 23–15–801(j) [8] and 809 [9]. Faced with

---

7. Mississippi Code Annotated § 23–15–973 provides in pertinent part that, "[i] shall be the duty of the judges of the circuit court to give a reasonable time and opportunity to the candidates for the office of judge of the Supreme Court, judges of the Court of Appeals, circuit judge and chancellor to address the people during court terms. In order to give further and every possible emphasis to the fact that the said judicial offices are not political but are held without favor and with absolute impartiality as to all persons, the judges thereof should be as far removed as possible from any political affiliations or obligations. It shall be unlawful for any candidate .. To align himself ... with any political faction or any political party...."

8. Miss.Code Ann. § 23–15–801(j) provides: The term "independent expenditure" shall mean an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate which is made without cooperation or consultation with any candidate or any authorized committee or agent of such candidate, and which is not made in concert with or at the request or suggestion of any candidate or any authorized committee or agent of such candidate.

9. Miss Code Ann. § 23–15–809 provides:

(a) Every person who makes independent expenditures in an aggregate amount or value in excess of Two Hundred Dollars ($200.00) during a calendar year shall file a statement containing the information required under Section 23–15–807. Such statement shall be filed with the appropriate offices as provided for in Section 23–15–805, and such person shall be considered a political committee for the purpose of determining place of filing.

(b) Statements required to be filed by this section shall include:

(i) Information indicating whether the independent expenditure is in support of,

the perceived risk of civil and criminal penalties [10] for continuing to televise these advertisements, the Chamber brought this lawsuit seeking to have this court declare its rights in this matter.

## II. *THE ADVERTISEMENTS*

The four advertisements precipitating this lawsuit are marked as Exhibits B, C, D and E to the plaintiff's complaint. Each advertisement is described below.

### *Exhibit B—The Chief Justice Lenore Prather Advertisement*

Exhibit B begins with the photograph of a gavel and a picture of Chief Justice Lenore Prather slowly materializes in the background. The narration states, "Lenore Prather -Chief Justice of Mississippi's Supreme Court; Lenore Prather—using common sense principles to uphold the law; Lenore Prather—putting victims rights ahead of criminals and protecting our Supreme Court from the influence of special interests." As the narration pro-

ceeds, the words "Chief Justice," "Common Sense," and "Victims Rights" appear on the screen. The narrator then states that Lenore Prather was the first woman appointed to the Mississippi Supreme Court, and that she has thirty-five years of experience.

### *Exhibit C—The Judge Keith Starrett Advertisement*

Exhibit C begins with the narration, "Keith Starrett—a common sense Justice." As pictures of Judge Starrett appear on the screen, followed by scenes of school children and scenes of citizens going about their daily routines, the narrator says that Keith Starrett formed the first drug court in Mississippi, and that Starrett's drug court saved taxpayers over one half million dollars in the first year. Then, as the words "Baptist Deacon" and "Victim's Rights Count" appear on the screen, the narration states, "a Baptist Deacon who once headed South Mississippi Child Protection, Starrett knows victims have as

---

or in opposition to, the candidate involved;

(ii)Under penalty of perjury, a certification of whether or not such independent expenditure is made in cooperation, consultation or concert with, or at request or suggestion of, any candidate or any authorized committee or agent of such candidate; and

(iii) The identification of each person who made a contribution in excess of Two Hundred Dollars ($200.00) to the person filing such statement which was made for the purpose of furthering an independent expenditure.

10. Mississippi Code Annotated § 23–15–811 provides that, (a) Any candidate or any other person who shall wilfully and deliberately and substantially violate the provisions and prohibitions of this article shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine in a sum not to exceed Three Thousand Dollars ($3,000.00) or imprisoned for not longer than six (6) months or by both fine and imprisonment.

(b) In addition to the penalties provided in paragraph (a) of this section, any candidate or political committee which is required to file a statement or report which fails to file such statement or report on the date in which it is due may be compelled to file such statement or report by an action in the nature of a mandamus.

(c) No candidate shall be certified as nominated for election or as elected to office unless and until he files all reports required by this article due as of the date of certification.

(d) No candidate who is elected to office shall receive any salary or other remuneration for the office unless and until he files all reports required by this article due as of the date such salary or remuneration is payable.

(e) In the event that a candidate fails to timely file any report required pursuant to this article but subsequently files a report or reports containing all of the information required to be reported by him as of the date on which the sanctions of paragraphs (c) and (d) of this section would be applied to him, such candidate shall not be subject to the sanctions of said paragraphs (c) and (d).

much a right to justice as defendants do." The narration closes with, "Judge Keith Starrett—he knows victims rights count!"

### Exhibit D—The Justice Kay Cobb Advertisement

Exhibit D is an advertisement touting incumbent Justice Kay Cobb. The narration provides the following, "A teacher, a prosecutor, a Supreme Court Judge. Justice Kay Cobb. At the Bureau of Narcotics she took drug pushers off the streets and put them behind bars. On the Supreme Court she uses common sense to protect the rights of victims." These words appear on the screen simultaneously as they are narrated. The narration then continues with, "Justice Kay Cobb has worked to end the judicial backlog, eliminate endless appeals and insure that death penalty cases are tried promptly." The narration concludes, "Justice Kay Cobb—victims rights count!"

### Exhibit E—The Justice Jim Smith Advertisement

Finally, Exhibit E is an advertisement for Justice Jim Smith. An American flag is in the background. The name Jim Smith remains visible throughout the narration, and a scales-of-justice appears in the left part of the screen. While the narration explains that Jim Smith uses common sense and puts victim's rights first, the words, "96% conviction rate" appear on the screen. The narrator states that, "[a]s a district attorney and prosecutor he had a 96% conviction rate. As a judge, he understands that victims rights come ahead of criminal's rights. Judge Jim Smith. For ten years on the Rankin County bench he upheld existing laws—instead of trying to make new ones. He carried that same common sense approach to the Supreme Court in 1993." The narration ends with, "Judge Jim Smith—common sense on the bench!"

All of the advertisements are about thirty seconds in length, and direct the viewer to a web site, *www.Litigation Fairness.org,* which contains a link to web pages which urge the support of the election of two of these particular candidates, Justice Cobb and Judge Starrett, while presenting the biographies of Chief Justice Prather and Justice Smith. A sample of these web pages are attached to this opinion as an appendix.

The advertisements *sub judice* do not dwell on any particular issue, but instead ascribe attributes which a voter might find to be desirable in a candidate for judicial office to each of the named candidates. Nor do the advertisements discuss, mention, implicate or concern any person other than the particular candidate being touted in the advertisement. The prominent references to judicial philosophy (common sense) and victim's rights are not accompanied by any elaboration. While the plaintiff contends that technically there is no mention of an election in these advertisements, the State of Mississippi notes that they are being aired at the same time statewide judicial elections are being conducted.

## III. STANDING AND RIPENESS

A federal court must find that Article III standing requirements are met before proceeding. These requirements include (1) "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) causation, meaning that the injury is "fairly traceable to the challenged action of the defendant"; and (3) redressability, meaning that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Valley v. Rapides Parish School Board,* 145 F.3d 329, 332 (5th Cir.1998), citing

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The standing component that deals directly with ripeness is the requirement of "imminence." In a declaratory action, the threatened injury must be "sufficiently 'imminent' to establish standing." *Id.* A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' *See Texas v. United States,* 523 U.S. 296, 118 S.Ct. 1257, 1259–60, 140 L.Ed.2d 406 (1998).

In the instant case the parties agree that the Chamber has standing, and the likelihood of litigation is conceded by the parties to be imminent. Therefore, the ripeness balance weighs in favor of addressing this controversy.

### IV. *THE APPLICABLE MISSISSIPPI STATUTES*

The Mississippi statutes providing the focal point of this lawsuit are Mississippi Code Annotated §§ 23–15–801(j) and 23–15–809, statutes dealing with independent expenditures for the purpose of advocating a particular electoral result, but without consulting with or obtaining the cooperation of any candidate. The Attorney General acknowledges that the advertising expenditures in question are individual expenditures, and that he has no proof that the Chamber has consulted any candidate or acted in collusion with any candidate in presenting these advertisements.

Mississippi Code Annotated § 23–15–801(j) provides that the term "independent expenditure" shall mean an expenditure by a person expressly advocating the election or defeat of a clearly identified candidate, without that candidate's cooperation or consultation. Mississippi Code Annotated § 23–15–809 provides that a person who makes independent expenditures in the

amount or value of Two Hundred Dollars ($200.00) or more during a calendar year shall file a statement containing the information required under § 23–15–807.

■ The Chamber contends that if these statutes are applied to the advertisements in question, then their application will offend the First and Fourteenth Amendments of the United States Constitution. The guaranties afforded by the First Amendment are protected by the due process clause of the Fourteenth Amendment. *Williams v. Rhodes,* 393 U.S. 23, 30–31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24, 31 (1968); *New York Times v. Sullivan,* 376 U.S. 254, 276–77, 84 S.Ct. 710, 724, 11 L.Ed.2d 686, 709 (1964); *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217 (1940); and *De Jonge v. Oregon,* 299 U.S. 353, 364, 57 S.Ct. 255, 260, 81 L.Ed. 278, 283 (1937). There is no question that political expression is protected speech under the First Amendment. *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999), citing *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The United States Supreme Court often has reaffirmed that speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection. *First National Bank v. Bellotti,* 435 U.S. 765, 776, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (stating that speech on matters of public concern is "at the heart of the First Amendment's protection"); and *Rash–Aldridge v. Ramirez,* 96 F.3d 117, 119 (5th Cir.1996) (same).

### V. *THE UNITED STATES SUPREME COURT PRECEDENTS*

The fountainhead case governing the issues of concern in the instant case is *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The *Buckley* decision limited the range of political speech that

may be regulated by the Federal Election Campaign Act only to "express advocacy," that is, a communication which explicitly advocates the election or defeat of clearly identifiable candidates. The Supreme Court's decision distinguished "issue advocacy," which is the discussion of issues and/or candidates' positions on them. Under *Buckley,* this form of communication is not subject to regulation. The *Buckley* decision, particularly its statement at footnote 52, has given rise to what is now referred to as the "express advocacy" standard. Footnote 52 of the *Buckley* opinion refers to § 608(e)(1) of the Federal Election Campaign Act and to the construction of statute's scope as being limited to communications containing express words of advocacy of election or defeat, such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat," and "reject." Other courts have given the "express advocacy" standard the rubric "magic words" test, or "bright line" rule. *See Federal Election Commission v. Christian Action Network, Inc.,* 110 F.3d 1049, 1051 (4th Cir.1997), referring to the "magic words" of Buckley's footnote 52; *and see Faucher v. Federal Election Commission,* 928 F.2d 468 (1st Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991) (for the reference to a "bright line" rule being established by *Buckley* ). Whether the standard is referred to as "express advocacy" or "magic words," or the "bright line" rule, many courts interpret this standard to require words of advocacy such as those recited in footnote 52 of the *Buckley* opinion before regulatory jurisdiction over an independent or corporate expenditure can exist.

The United States Supreme Court revisited the *Buckley* decision in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 248–49, 107 S.Ct. 616, 623, 93 L.Ed.2d 539 (1986) (a case often referred to in short as "MCFL"). Here the Supreme Court was faced for the first time since its decision in *Buckley* with a form of advertisement, specifically, a newsletter.

The MCFL, an nonprofit group concerned with right-to-life issues, prepared and distributed a newsletter in the ordinary course of its operations. Prior to the September 1978 primary elections, the MCFL printed and distributed a "Special Edition" of its newsletter. While the May 1978 edition of the newsletter had been mailed to 2,109 people, and the October 1978 edition to 3,119 people, more than 100,000 copies of the "Special Edition" were printed for distribution. The front page of the publication was headlined "EVERYTHING YOU NEED TO KNOW TO VOTE PRO–LIFE," and readers were admonished that "[n]o pro-life candidate can win in November without your vote in September." "VOTE PRO–LIFE" was printed in large bold-faced letters on the back page, and a coupon was provided to be clipped and taken to the polls to remind voters of the name of the "pro-life" candidates. Next to the exhortation to vote "pro-life" was a disclaimer: "This special election edition does not represent an endorsement of any particular candidate."

The *MCFL* Court also held that an expenditure must constitute "express advocacy" in order to be subject to the statutory prohibition in question, and that the Special Edition constituted express advocacy, citing *Buckley.* The *MCFL* Court stated that, "*Buckley* adopted the 'express advocacy' requirement to distinguish discussion of issues and candidates from more pointed exhortations to vote for particular persons. We therefore concluded in that case that a finding of 'express advocacy' depended upon the use of language such as 'vote for,' 'elect,' 'support,' etc." *MCFL,* 479 U.S., at 248, 107 S.Ct. 616, citing *Buckley, supra,* at 44, n. 52, 96 S.Ct., at

646, n. 52. The MCFL Court then noted that the Special Edition not only urged voters to vote for "pro-life" candidates, but also identified and provided photographs of specific candidates fitting that description. Said the Court, "[t]he Edition cannot be regarded as a mere discussion of public issues that by their nature raise the names of certain politicians. Rather, *it provides in effect an explicit directive: vote for these (named) candidates. The fact that this message is marginally less direct than 'Vote for Smith' does not change its essential nature....*" *MCFL,* 479 U.S., at 240, 107 S.Ct. 616 (Emphasis added).

Thus, the *MCFL* Court, faced with an actual communication, determined that "express advocacy" was present in the "Special Edition" of MCFL's newsletter based on the timing of the edition, the unusually large quantity of copies being disseminated, and the exhortations to vote for pro-life candidates, notwithstanding the absence of the "magic words" found at footnote 52 of the *Buckley* decision.

## VI. *THE CIRCUIT DIVIDE*

### A. The Narrow Interpretation

Several Circuit Courts which have had the opportunity to apply the "express advocacy" test based on *Buckley* and *MCFL* have adopted a very narrow construction of what these cases require. For instance, in *Maine Right to Life Committee, Inc. v. Federal Election Commission,* 914 F.Supp. 8 (D.Me.1996), *aff'd per curiam,* 98 F.3d 1 (1st Cir.1996) (referring to *Buckley* as having established a "bright line" rule), a nonprofit membership corporation and a reader of its publications brought suit seeking a declaratory judgment that the Federal Election Commission's definition of "express advocacy" as to which corporate financial support was prohibited under the Federal Election Campaign Act was too broad, beyond authority, and unconstitutionally vague. The district court

agreed, applying the bright line rule that a finding of "express advocacy" requires the presence in a communication of some or all of the explicit words found at footnote 52 of the *Buckley* opinion. Like *Buckley, Maine Right to Life Committee* dealt with the interpretation of legislation rather than a specific communication. *See also, Faucher v. Federal Election Commission,* 743 F.Supp. 64, 68 (D.Me.1990), *aff'd,* 928 F.2d 468 (1st Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991), following *Buckley* by narrowly construing the same federal election laws considered in *Buckley.*

In *Federal Election Commission v. Christian Action Network,* 110 F.3d 1049 (4th Cir.1997), the Fourth Circuit affirmed the district court's dismissal of a Federal Election Commission lawsuit which complained that an advocacy organization's expenditures for a television commercial violated federal election laws governing disclosure of campaign funds. The advertisement in question included the following text which was read by a narrator: "Bill Clinton's vision for America includes job quotas for homosexuals, giving homosexuals special civil rights, allowing homosexuals in the armed forces. Al Gore supports homosexual couples' adopting children and becoming foster parents. Is this your vision for a better America? For more information on traditional family values, contact the Christian Action Network."

The Fourth Circuit opted for the "clear, categorical limitation of *Buckley,* holding that only expenditures for communications using explicit words of candidate advocacy are prohibited...." *Id.* at 1051. The Fourth Circuit therefore rejected the Federal Election Commission's position that "express advocacy" could be established by looking at a group's use of imagery, rheto-

ric, and symbols in criticizing a candidate's position. *Id.*, at 1064.

In *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963 (8th Cir.1999), various organizations which had as one of their purposes political speech sought a preliminary injunction against the enforcement of a provision of an Iowa Campaign Disclosure–Income Tax Check-off Act containing reporting requirements for independent political expenditures. The district court granted the injunction and the Eighth Circuit affirmed, holding that the *Buckley* decision made clear that a "finding of 'express advocacy' depend[s] upon the use of language such as 'vote for,' 'elect,' 'support,' etc." Significantly, the Eighth Circuit noted that *Buckley* did not provide an exclusive list of words, and that any such communication must contain express language of advocacy with an exhortation to elect or defeat a candidate. The Eighth Circuit also cited *Federal Election Commission v. Furgatch*, 807 F.2d 857, 864 (9th Cir.1987) and its teaching that speech may be termed "advocacy" if it presents a clear plea for action. Speech that is merely informative, said the Eighth Circuit, is not covered by the Act.[11]

*Vermont Right to Life Committee v. Sorrell*, 221 F.3d 376 (2nd Cir.2000), involved a nonprofit corporation (the VRLC) whose goal was to promote right-to-life issues. The VRLC brought a § 1983 action against various state officials, seeking a declaratory judgment that certain sections of a Vermont campaign finance law establishing disclosure requirements for political advertising and reporting requirements for mass media expenditures were facially unconstitutional under the First Amendment. The Second Circuit reversed the district court's dismissal of the case, holding that the plaintiffs had standing. The Court noted that a significant issue would be whether the state statutes in question applied only to advertising and "mass media activities" "that expressly advocated the election or defeat of a clearly identified candidate," citing *Buckley*. *See also, Federal Election Commission v. Central Long Island Tax Reform Immediately Committee*, 616 F.2d 45 (2nd Cir.1980), following the narrower standard based on *Buckley*'s footnote 52.

### B. The Broader Interpretation

Set against the narrow interpretation applied by the First, Second, Fourth and Eighth Circuits is the Ninth Circuit's decision in *Federal Election Commission v. Furgatch*, 807 F.2d 857 (9th Cir.), *cert. denied*, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 106 (1987). According to *Furgatch*, express advocacy may exist if the purpose of the message in question is suggestive of only one meaning, makes a clear plea for action, and is clear as to what action is advocated. *Id.*, at 864.

*Furgatch* involved an enforcement action against an individual for publishing a newspaper advertisement critical of President Jimmy Carter and urging the readers "Don't let him do it." The Federal Election Commission (hereinafter the "FEC") sued, claiming a violation of Federal Election Campaign Act for the failure to report this expenditure to the FEC and to place a disclaimer on it. The Ninth Circuit agreed with the FEC that these violations had occurred, stating that, "reasonable minds could not dispute that Furgatch's adver-

---

**11.** While the Eighth Circuit's decision is touted by the plaintiffs and strictly following *Buckley*, it is apparent that the Eight Circuit did not consider a finding of express advocacy to be strictly limited to the words contained in *Buckley*'s footnote 52, noting that in *Federal Election Commission v. Furgatch*, 807 F.2d 857 (9th Cir.), *cert. denied*, 484 U.S. 850, 108 S.Ct. 151, 98 L.Ed.2d 106 (1987), the Ninth Circuit had allowed the prohibition of the "Don't Let Him Do It" speech as expressed advocacy, and recognizing that the ruling was "a very close call," *id.*, at 861.

tisement urged readers to vote against Jimmy Carter. This was the only action open to those who would not 'let him do it.'" *Id.*, at 864. The court summarized its holding as follows:

> We conclude that speech need not include any of the words listed in Buckley to be express advocacy under the Act, but it must, when read as a whole, and with limited reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a specific candidate. This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is "express" for present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed "advocacy" if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be "express advocacy of the election or defeat of a clearly identified candidate" when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action. We emphasize that if any reasonable alternative reading of speech can be suggested, it cannot be express advocacy subject to the Act's disclosure requirements. This is necessary and sufficient to prevent a chill on forms of speech other than the campaign advertising

regulated by the Act. At the same time, however, the court is not forced under this standard to ignore the plain meaning of campaign-related speech in a search for certain fixed indicators of 'express advocacy.'

*Id.*, at 864.

The *Furgatch* decision takes its lead from the United States Supreme Court's decisions in both *Buckley* and *MCFL*.[12] Cases which have adopted the approach taken in the *Furgatch* decision are *FEC v. National Organization for Women*, 713 F.Supp. 428, 434 (D.D.C.1989); *Osterberg v. Peca*, 12 S.W.3d 31, 52 (Tex.2000); *State Elections Bd. v. Wisconsin Manufacturers & Commerce*, 227 Wis.2d 650, 597 N.W.2d 721, 723–24, 731 (1999); and *State ex rel. Crumpton v. Keisling*, 160 Or.App. 406, 982 P.2d 3, 10 (1999).

In *Federal Election Commission v. National Organization for Women*, NOW used corporate money to pay for three letters sent to the general public which contained so called "electioneering messages." According to NOW, these letters were aimed solely at soliciting new members by setting forth the group's political goals. One of the letters in question urged the recipient to join NOW and to wear a 59 cents button as a symbol of the fact that women earn 59 cents for every dollar earned by men. While the letter focused on issues (wage discrimination, Social Security, divorce law, education), it also criticized political leaders for their adverse positions or lack of attention to these issues. Three sentences in the four-page

---

**12.** The *Furgatch* Court cited the First Circuit's opinion in *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 769 F.2d 13 (1st Cir.1985)(MCFL), which was on appeal to the United States Supreme Court at the time the *Furgatch* case was argued to the Ninth Circuit in June of 1986. On December 15, 1986, the United States Supreme Court affirmed the First Circuit's decision in *MCFL*.

The Ninth Circuit handed down *Furgatch* on January 9, 1987. Even though the *Furgatch* Court may have missed the opportunity to include the United States Supreme Court citation in its final opinion draft, the relevant points of law remained the same. The First Circuit's *MCFL* decision being affirmed by the United States Supreme Court did not disturb the *Furgatch* decision.

"59 cents letter" are critical of public officials: "And now the Reagan Administration is threatening to make a dangerous situation even worse...." "A bad economy, coupled with an antagonistic Administration in Washington, poses an immediate and real threat to the economic rights of women everywhere...."; and "The New Right, the Reagan Administration, and the Republican Party all thought that 'the ladies' would go away after the ERA deadline expired. Were they ever wrong!"

The district court held that this and two other similar letters contained no express advocacy as required by *Buckley* and *MCFL* to place the letters within the ambit of the federal statute. "The words listed in *Buckley*," said the district court, "are not the only ones which will be deemed express advocacy." In *Furgatch*, the Ninth Circuit held that express advocacy is not strictly limited to communications using certain key phrases. "The short list of words included in the Supreme Court's opinion in *Buckley* does not exhaust the capacity of the English language to expressly advocate the election or defeat of a candidate." *Furgatch*, 807 F.2d at 863. The court of appeals proposed a standard for express advocacy: that speech, when read as a whole and with limited reference to external events, may only be interpreted as an exhortation to vote for or against a specific candidate.

Following the broader standard, the district court concluded that, "[b]ecause the letters are suggestive of several plausible meanings, because there are numerous pleas for action, and because the types of action are varied and not entirely clear, NOW's letters fail the express advocacy test." 713 F.Supp., at 435. The district court also noted that NOW's three mailings included no explicit words directing the reader how to vote.

In *State ex rel. Crumpton v. Keisling*, the Oregon Court was confronted with mailings and newspaper advertisements that contained a "WARNING" that public employee unions were buying the "DEMOCRAT[IC] ELECTIONS." These advertisements contained the pictures of particular candidates and the amount of support each had received from public employee unions. The Oregon court expressed the same concerns as the Ninth Circuit in *Furgatch* that election laws must not be "cleverly circumvented, or thwarted by a rigid construction." Thus, the Court adopted the *Furgatch* "reasonable minds could differ" test. 160 Or.App. 406, 982 P.2d 3, 10 (1999). "The purpose," said the Court, "is not to search for magic words—which careful drafters can, as in this case, usually avoid—but to find the essential message that the publication communicates to the reader. In doing this, the context of the publication—particularly whether or not it came in the midst of a contested election campaign—can play a role in determining how the reader would understand it and, thus, what its message is." *Id.*

In *Osterberg v. Peca*, 12 S.W.3d 31, 52 (Tex.2000), the Osterbergs, aggrieved at a ruling by Judge Peca, donated $34,200.00 to the campaign of his opponent in the subsequent election, and paid for a television advertisement which consisted of the following text: "CONSIDER THIS: Judge Peca was chosen by his peers El Paso's outstanding jurist; He graduated Summa Cum Laude; He worked to reduce his docket for over seven years; IF THAT'S ENOUGH, VOTE FOR HIM. [next screen] But if you want ONE who understands: The Courthouse exists for the people ... etc. BRING THE COURTHOUSE BACK TO THE PEOPLE! VOTE FOR HIS OPPONENT and remove HIM if he fails the will of the people!" The Texas Court refused to accept the contention that the *Buckley* test required the application of a rigid stan-

dard, noting that while *Buckley* restricted "express advocacy" to "spending that is unambiguously related to the campaign of a particular federal candidate" and to "communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject,' " *Id.* at 44 n. 52, 96 S.Ct. 612, the United States Supreme Court in *MCFL* had stepped beyond the rigid test of *Buckley* by stating that a message can be "marginally less direct" than the examples listed in *Buckley* so long as its essential nature "goes beyond issue discussion to express electoral advocacy." *See MCFL,* 479 U.S., at 249, 107 S.Ct. 616.

The *Osterberg* Court also observed that the descriptions given in *Buckley* and *MCFL,* "do not give unambiguous answers to the myriad situations that arise." *Id.,* 12 S.W.3d, at 52, citing *Wisconsin Right to Life, Inc. v. Paradise,* 138 F.3d 1183, 1186 (7th Cir.), *cert. denied,* 525 U.S. 873, 119 S.Ct. 172, 142 L.Ed.2d 140 (1998) for that same observation.

## VII. THE RESPECTIVE POSITIONS OF THE PARTIES SUB JUDICE

The Chamber contends that this court must employ the "magic words" test to this dispute *sub judice,* a standard, says the Chamber, which has been applied by the majority of other jurisdictions which have had the opportunity to address this question. So long as the words used in Buckley's footnote 52 are avoided, says the

Chamber, political speakers avoid regulation under any circumstances. During oral argument this court posed a number of hypotheticals to counsel for the Chamber seeking to determine the Chamber's perspective on the scope of *Buckley.* In response to each of the court's hypotheticals, Chamber's counsel responded that unless the advertisements contained one of the eight magic words appearing at *Buckley*'s footnote 52, the advertisements should not be construed as examples of express advocacy.[13]

In contrast, the State of Mississippi argues that the court should not leave common sense at the doorstep when it considers these matters, and that the definition of "express advocacy" should not require the court to be blind to what all "others can see and understand." The "magic words" approach, says the State of Mississippi, creates a large loophole which would allow all forms of organizations inside and outside of Mississippi to spend unlimited funds on commercials which unambiguously support candidates, with no transparency regarding the source of the funding. The Chamber, says the State of Mississippi, should not be permitted to take refuge in the "magic words" approach simply by cleverly omitting from the commercials in question the specific words listed at footnote 52 of the *Buckley* decision. In summary, the State is concerned that persons or organizations will surreptitiously advocate the election or defeat of a named candidate but avoid legitimate government

**13.** During oral argument this court asked plaintiff's counsel whether either of the following instances would offend the express advocacy test:

(1) a narration of the favored candidate's qualifications, a picture of the favored candidate along side the opponent with a line drawn through the picture of the opponent, all superimposed over people standing in what appears to be a voting line; and (2) an advertisement identical to one paid for and run by a specific candidate in which the candidate merely states a qualification while the independent ad simply omitting the words "vote for me" contained in the candidate's ad. Counsel responded that neither of these examples contained express advocacy under the bright line standard of *Buckley.* Thus, plaintiff's counsel sees no crack in the express advocacy test, unless the ad contains "magic words."

regulation by simply omitting "magic words" of advocacy. *See Iowa Right to Life Comm., Inc. v. Williams,* 187 F.3d 963, 970 (8th Cir.1999) (commenting on the State of Iowa's position in the *Williams* case).

## VIII. *ANALYSIS*

■ Express advocacy is a very narrow class of election-related speech that in "explicit words" or by "express terms advocates the election or defeat of a clearly identified candidate." *Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 248–49, 107 S.Ct. 616, 623, 93 L.Ed.2d 539 (1986). In contrast to express advocacy, issue advocacy is the discussion of issues and candidates' positions on those issues without expressly advocating a candidate's election or defeat. The United States Supreme Court has recognized that issue advocacy sometimes may influence the election or defeat of particular candidates, but that does not convert it into express advocacy. Issue advocacy is protected by the First Amendment and can be subjected to no regulation, regardless of its effect on an election. *See MCFL,* 479 U.S., at 257 n. 10, 107 S.Ct. 616. So, the question to be resolved by this court is whether the advertisements at hand constitute merely issue discussion, or whether they expressly advocate for the election of a particular candidate. A court analyzing whether a given statute comports with the First Amendment must hesitate before "imposing judicial formulae so rigid that they become a straightjacket that disables Government from responding to serious problems." *Denver Area Educational Telecommunications Consortium, Inc. v. F.C.C.,* 518 U.S. 727, 116 S.Ct. 2374, 2385, 135 L.Ed.2d 888 (1996).

This court, in opposition to the Chamber's urgings, declines to strictly limit express advocacy to the "magic words" of *Buckley*'s footnote 52. As *Furgatch* correctly observed, *Buckley*'s footnote 52 does "not exhaust the capacity of the English language to expressly advocate the election or defeat of a candidate." *Furgatch,* at pages 862–63. Further, and even more importantly, the United States Supreme Court itself, in this court's eye, in *MCFL* determined to move beyond the rigid, overly simplistic "magic words" test of *Buckley.* In *MCFL,* the Court seemingly moved away from a rigid, talismanic application of *Buckley*'s footnote 52 to an "essential nature" inquiry, as the Court found express advocacy even though the communication at issue was, "marginally less direct than 'Vote for Smith'," one of the "magic words" contained in footnote 52 of the *Buckley* opinion.

■ Whether examining the advertisements at hand under the "essential nature" test of *MCFL,* or under *Furgatch*'s "no other reasonable interpretation" test, this court finds that the advertisements at issue provide explicit directives to vote for the named candidates. These advertisements simply cannot be regarded as mere discussions of public issues. Aired [14] at the very time statewide judicial elections were being conducted in Mississippi, the advertisements contain no true discussion of issues. While the advertisements mention "victims rights" and a "common sense judicial philosophy," the advertisements present no elaboration of these points. Instead, while providing only the background and experience of each candidate, the advertisements repeatedly insert the candidates' names between qualification assertions and each advertisement concludes

---

**14.** While timing itself is no talisman of express advocacy, it is a useful element in the court's overall consideration, just as it was in *MCFL,* where the Supreme Court noted that

the 100,000 copies of the "Special Edition" were prepared for dissemination during the September 1978 primary elections.

with an emphatic phrase obviously designed to exhort support for the candidates' election to the Mississippi Supreme Court. Although the express words "vote for the candidate" do not appear anywhere in the advertisements, no reasonable viewer would construe the advertisements otherwise. The viewer sees a sleek, well prepared advertisement, just as a candidate's campaign staff might prepare.

Further, these advertisements are virtually the same as the advertisements being aired by the candidates themselves. The advertisements repeat the touted candidates' names in the very same manner as the candidates own advertisements which exhort the viewing public to vote for the named candidates. In this court's view, a finding of any use of "magic words" becomes unnecessary when an advertisement clearly champions the election of a particular candidate as the person who will use common sense, ensure prompt adjudication of death penalty cases and uphold victim's rights.

The advertisements display a web site, *www.LitigationFairness.org.* Significantly, when accessed, the web site contains a link entitled "Mississippi Candidate Information." The link ultimately leads to web pages which exhort the public's support for the election of two of the named candidates, Justice Kay Cobb and Judge Keith Starrett.

True issue advocacy invigorates debate on many issues such as the environment, civil rights, welfare and education, and other matters which, due to their nature, may name candidates who are either supportive of, or contrary to a particular issue. Also critical in the overall calculus, however, is the necessity of having legislation which is effective and capable of informing the public, while condemning abuse of the special status given to true issue advocacy. Ever seeking to be vigilant for the protection of true issue advocacy, this court concludes that legitimate issue advocacy is not before the court today, and that this ruling will not have a chilling effect upon those anxious to exercise their First Amendment political speech rights.

## IX.  *CONCLUSION*

Therefore, this court finds the advertisements in question contain express advocacy, and are offensive under *Buckley* and *MCFL*. This court is persuaded that these advertisements do not attempt to discuss issues. Rather, the advertisements offer thinly veiled exhortations to support the campaigns of the aforesaid candidates, a plain, clever attempt to avoid the reach of the Mississippi reporting and disclosure laws by eliminating those words listed at footnote 52 of *Buckley*.

Accordingly, this court hereby denies the request of the Chamber of Commerce of the United States of America for declaratory relief from any subjection to the Mississippi laws governing independent expenditures. Instead, the court finds that the advertisements at issue which favor four specific candidates for the popularly elected Mississippi Supreme Court expressly advocate their elections and, as such, the Chamber must answer under Mississippi's contribution limits and reporting requirements as found at Mississippi Code Annotated §§ 23–15–801 et seq.

The Court shall enter a separate judgment in accordance with Rule 58 of the Federal Rules of Civil Procedure.

762

**itionFairness.org**

About LFC

Key Issues

Free Newsletter

Spread The Word

Contact Us

How Frivolous
Lawsuits Affect You

Contribute Now

Contact Your Elected
Official

Media

Links

Mississippi
Candidate
Information

...imated number of *new lawsuits
filed since January 1st 2000.*

**Litigation Fairness Campa**

$A$merica needs *your* help !

We want to stop the tidal wave of new lawsuits aimed at people like you, investment yours and businesses like yours—anywhere the trial bar thinks it can make a fee.

We are the Litigation Fairness Campaign: dedicated to mobilizing concerned citizens like you to help us fight for more fairness against this ever increasing tidal wave of new, frivolous and expensive lawsuits.

This site will:
1. answer your questions

2. give you choices on how and where you can become involved in fighting for fairness

Annual Cost of the U.S. Tort

$ in Billions

160

120

80

40

0

*Source:*
*Tort Cost Trends: An International Perspective, Appe*

1930    1984    1991    19

It's your *investments*, your *........,* your *........,*
Thank you for reviewing our website.

  

Produced by *Bonner & Associates,*
Washington, D.C.

ifionFairness.org

...nated number of *new lawsuits filed since January 1st 2000.*

Litigation Fairness Campaign

## Mississippi Candidate Information

Kay Cobb

Lenore Prather

Jim Smith

Keith Starret

About LFC
Key Issues
Free Newsletter
Spread The Word
Contact Us
How Frivolous
Lawsuits Affect You
Contribute Now
Contact Your Elected
Official
Media
Links

Produced by *Bonner & Associates*,
Washington, D.C.

 

**● Integrity**
**● Fairness**
**● Experience**

★ Home   ★ Biography   ★ District Info   ★ Volunteer/Donate   ★ Feedback

Dear Friend,

Thank you for taking your time to view my web site. I hope you will find it helpful as you learn more about me and my campaign to remain on the Mississippi Supreme Court for a full term.

By way of introduction, I currently represent District 3, Place 1 on the Mississippi Supreme Court. The Third District includes the following thirty-three (33) counties:

| | | | |
|---|---|---|---|
| Alcorn | Desoto | Panola | Tate |
| Attala | Grenada | Pontotoc | Tippah |
| Benton | Itawamba | Lowndes | Tishomingo |
| Calhoun | Lafayette | Marshall | Tunica |
| Carroll | Lee | Monroe | Union |
| Chickasaw | Leflore | Prentiss | Webster |
| Choctaw | Montgomery | Quitman | Winston |
| Clay | Oktibbeha | Tallahatchie | Yalobusha |
| Coahoma | | | |

This web site is structured to give you information about me, my campaign and the Supreme Court district I represent. This site includes a Feedback section for you to communicate questions, comments and information back to me.

Thank you for your interest in my campaign. Your support is important to me and will be very much appreciated! Please join us today.

Sincerely,

*Kay B. Cobb*

Kay B. Cobb

★ Home   ★ Biography   ★ District Info   ★ Volunteer/Donate   ★ Feedback

© 2000 Committee to Elect Kay Cobb
Kenneth L. Lundquist & Mary Belle Lundquist, Treasurers
P.O. Box 1499
Oxford, MS 38655
1-888-969-2622
kcobbcampaign@watervalley.net
Site Developed and Maintained by
Taylor & Pond Corporate Communications

 

♦ Integrity

♦ Fairness

♦ Experience

★ Home  ★ Biography  ★ District Info  ★ Volunteer/Donate  ★ Feedback

## Personal Data

Home Address: 110 Downing St. , PO Box 604 Oxford, MS 38865

Home Phone: (662) 234-8136

Fax; E-mail: (662) 513-0325; kaycobb@watervalley.net

Family: Husband, Larry D. Cobb, married 37 years Daughters, Barbara C. Murphy and Elizabeth C. DeBusk; sons-in-law David Murphy and Brian DeBusk; grandchildren Megan and Erin Murphy and Robert, Lauren and Michael Debusk

History: Born February 28, 1942. Native of Quitman County, MS; reared in Cleveland, MS; resident of Oxford, MS past 25 years

## Professional Experience

April 1, 1999-Present: Associate Justice, Mississippi Supreme Court;Chairman, Continuing Judicial Education Commission; Member, Advisory Committee on Criminal Laws, MS Bar; Appellate Judge's training, New York University Law School, July, 1999

January 1996-March 1999: General practice of law, Oxford, MS

January 1992-January 1996: State Senator, Mississippi District 9 - Calhoun, Lafayette and Yalobusha counties, Part-time General law practice, Oxford, MS

July 1988-January 1992: Special Assistant Attorney General - North Mississippi. Established, staffed and managed the Northern Regional Office of the Attorney General in Oxford, MS. Performed all general duties of the Attorney General's office. Served as liaison between Citizens of North Missippi and the state Attorney General's staff. Also served as SWEEPS (StateWide Education, Enforcement, Prevention System) Coordinator, responsible for statewide community mobilization in drug education and prevention efforts and staffed the Mississippi Substance Abuse Policy Council.

December 1984-June 1988: Senior Attorney for Mississippi Bureau of Narcotics; represented the Bureau in asset forfeiture proceedings in state courts throughout Mississippi; advised and trained Bureau agents on law enforcement procedures, all aspects of criminal law, and asset forfeiture; drafted and presented all drug/Bureau legislation for state legislature; also performed other usual duties of staff attorney. Instructor in criminal law at Mississippi Law Enforcement Officers Training Academy, Jackson Police Department, U.S. Drug Enforcement Administration DMEP School, Mississippi Highway Patrol T-Cap Schools, and local law enforcement department training programs. Selected as only Mississippian selected to attend the Third Annual FBI training course for Law Enforcement Legal Advisors, Quantico, VA, 1985

November 1982-December 1984: Director/Coordinator of Prosecutor Programs, Mississippi Prosecutors College, University of Mississippi Law School. Directed training and research for District Attorneys and other prosecuting attorneys throughout the state; drafted and

presented legislation for, and directed activities of, the Mississippi Prosecutors Association.

January 1978-December 1984: Self-employed attorney engaged in Part-time general law practice, Oxford, Mississippi. Admitted to practice before all courts of the State of Mississippi and the United States Northern District Court.

January 1963-June 1975: Taught school three years, then remained home after children's birth; five years as counselor/handicapped placement specialist; Texas Employment Commission.

## Professional Activities

President's Commission on United States Model State Drug Laws, 1992-93
National Alliance for Model State Drug Laws, 1993 - Present
Mississippi Bar Association, 1978 - Present; member of various committees, including the Commission on the Courts for the 21st Century 1992-94
Lafayette County Bar Association, 1978 - Present
President, 1982; Vice President, 1981; Secretary 1980
Mississippi Prosecutors Association, 1982 - 1988
Mississippi Women Lawyers Association, 1999 - Present
Southern Women In Public Service - Pacesetter, 1992, 2000

## Education

Professional: University of Mississippi School of Law 1975-1977.
Graduated 13th in class;
Admitted to the Mississippi Bar, January 1978
Activities and Achievements in Law School:
National Moot Court Team, 1976 Southern Regional winner
Journal of Space Law, 1976-77; Editor 1977
Moot Court Board, 1976-77; Curriculum Chair, 1977
Phi Delta Phi Law Fraternity - President 1977; Secretary and Exchequer, 1976
Law School Senate - 1975-76
Recipient of Phi Delta Phi Scholarship Award - 1976
Recipient of Phi Alpha Delta Award - 1977

Undergraduate: Mississippi University for Women, 1959-63
B.S. Degree, 1963
Activities and Achievements:
Hall of Fame
Who's Who in American Universities and Colleges
President of Class and other campus organizations
Mortar Board
Borden Scholarship Award

Secondary: Cleveland High School, Cleveland MS
Valedictorian, Graduated June, 1959

## Civic And Community Activities

Inter-Alumni Council, State Insitutions of Higher Learning (combined Alumni council for all eight universities)
Chair 1988-89; Vice Chair 1987-88; Member 1983-1999
Mississippi University for Women Alumnae Association Board, 1981-Present; President 1983-84; Vice President 1982-83. Parliamentarian 1981-82 and 1990-91
MUW Foundation Board 1987-92
MUW Alumnae Achievement Award, 1986
MUW Medal of Excellence, 1990
Oxford-Lafayette County Chamber of Commerce, 1978-Present; Lafayette Leadership, 1989
Lafayette County Extension Advisory Council, 1985-Present
Lafayette County SWEEPS Council, 1989-1995
MSU Outstanding Mississippi Woman Award, 1992
National Youth Sports Program Advisory Board, 1993-Present
Oxford AAUW (American Association of University Women) Woman of Achievement Award, 1993
Leadership Lafayette - Legacy of Leadership Award 1995
Business and Professional Women, former President
Oxford Pilot club, 1997-99

First Baptist Church, Oxford, 1976-Present; former choir member; Sunday School Teacher, 1997-Present
Oxford - Lafayette County Vision 20/20 Task Force Member and Chair, Government Committee, 1998

## Mississippi Senate: 1992-1996

Chairman: Elections Committee; Joint Chairman, Congressional Redistricting, Legislative Apportionment Committees 1993-96

Vice-Chairman: Judiciary 1992

Member: Agriculture, Appropriations, Corrections, Education, Environmental Protection, Fees and Salaries, Judiciary, Universities and Colleges Committees

Subcommitte Chairman: Corrections; Fees and Salaries; Judiciary

Secretary: Senate Appropriations

Represented the Senate on the Special Parole Commission, Environmental Protection Council, and Chapter II Advisory Board
Toll Fellowship (one of 35 in the nation) awarded by the Council of State Governments

★ Home    ★ Biography    ★ District Info    ★ Volunteer/Donate    ★ Feedback

© 2000 Committee to Elect Kay Cobb
Kenneth L. Lundquist & Mary Belle Lundquist, Treasurers
P.O. Box 1499
Oxford, MS 38655
1-888-969-2622
kcobbcampaign@watervalley.net

 

- ♦ Integrity
- ♦ Fairness
- ♦ Experience

★ Home   ★ Biography   ★ District Info   ★ Volunteer/Donate   ★ Feedback

To assist you in determining whether or not you vote in the Northern District, please note the following counties shown on the map below:

For names of local community contact persons, or more information about campaign activities, just click on your county.

★ Home   ★ Biography   ★ District Info   ★ Volunteer/Donate   ★ Feedback

© 2000 Committee to Elect Kay Cobb
Kenneth L. Lundquist & Mary Belle Lundquist, Treasurers
P.O. Box 1499
Oxford, MS 38655
1-888-969-2622
kcobbcampaign@watervalley.net

 

★ Home ★ Biography ★ District Info ★ Volunteer/Donate ★ Feedback

Thank you for your interest in getting actively involved in Kay's election campaign. We welcome the opportunity to utilize your energy and talents for the cause!

Kay, I want to help your campaign by: (check all that apply)

☐ Organizing in my neighborhood or county
☐ Writing letters to the editor
☐ Emailing my friends about Kay Cobb
☐ Putting a sign in my yard
☐ Telephoning voters
☐ Writing cards or letters of support
☐ Helping to raise funds
☐ Donating funds in the amount of $

**General Information**

Title:

First Name:

Last Name:

Address:

City:

State:

Zip:

County:

Precinct/Voting Location:

Occupation:

**Contact Information**

Daytime Phone:

Evening Phone:

Fax Number:

**770**

Fax Number: |_____|

Email Address: |_____|

[ Send Response ] [ Reset Form ]

★ Home     ★ Biography     ★ District Info     ★ Volunteer/Donate     ★ Feedback

© 2000 Committee to Elect Kay Cobb
Kenneth L. Lundquist & Mary Belle Lundquist, Treasurers
P.O. Box 1499
Oxford, MS 38655
1-888-969-2622
kcobbcampaign@watervalley.net

 

**♦ Integrity**
**♦ Fairness**
**♦ Experience**

★ Home   ★ Biography   ★ District Info   ★ Volunteer/Donate   ★ Feedback

We welcome any questions or comments you may have. Use the form below to give us your feedback, and we will reply as soon as possible.

Your Name:

Organization:

Your Email Address:

Your Message:

Send Mail   Reset Form

★ Home   ★ Biography   ★ District Info   ★ Volunteer/Donate   ★ Feedback

© 2000 Committee to Elect Kay Cobb
Kenneth L. Lundquist & Mary Belle Lundquist, Treasurers
P.O. Box 1499
Oxford, MS 38655
1-888-969-2622
kcobbcampaign@watervalley.net

# Keith Starrett for Mississippi Supreme Court

**Get Conn**

HOMEPAGE
BIOGRAPHY
IN THE NEWS
VOLUNTEER
EVENTS
HEADQUARTERS
MORE INFORMATION
CONTACT US
CONTRIBUTE

First Name

Last Name

E-mail

## Welcome

Welcome, You have reached the ONLY, official authorized website for Judge Keith Starrett's Mississippi Supreme Court campaign.

Throughout his career as an assistant district attorney, trial lawyer, and circuit judge for the 14th District, Starrett has served with integrity, character, and intellectual honesty. Starrett started the first felony level drug court in the state, was instrumental in obtaining successful GED programs for the Pike County Jail, and has been a leader in protecting crime victim's rights since taking the circuit bench. Starrett is an innovative and fair judge that has the character, fortitude, and real experience gained from serving as a circuit judge to make him the best candidate for the Mississippi Supreme Court.

With your help and support, Starrett will be elected to the Supreme Court and go to work using his experience to continue to improve the legal system of Mississippi.

Please take a few minutes to browse around this website and learn more about the next Mississippi Supreme Court justice for the Southern District, Position 2 seat. You can sign up to volunteer for the campaign, or make a contribution to ensure our campaign has the resources to march to victory on Election Day.

Again, Welcome! Together, we will win in November and forge a brighter future for Mississippi.

## Latest News

▸September 7, 2000 - The Clarion-Ledger - Justices Seek State Funding For Drug Courts
By Beverly Pettigrew Kraft

▸September 1, 2000 - The Sun Herald - Starret Wants Conservative On Supreme Court
By Brad Branan

▸August 21, 2000 - Mississippi Business Journal - Business Should Pay Attention to Judicial Races
By Elizabeth Kirkland Article discusses PAC endorsed

By Elizabeth Kirkland Article discusses PAC endorsed candidates including BIPEC's recommendation of Judge Keith Starrett for Supreme Court in the Southern District

more...

"Paid for and authorized by Friends of Keith Starrett. Copyright 2000. All rights reserved."

# Keith Starrett for Mississippi Supreme Court

<< HOMEPAGE

## Volunteer

Your participation is vital to my campaign. Please take a few minutes to let us know about you and how you might be interested in helping the campaign.

Fields marked with a "*" are required.

HOMEPAGE
BIOGRAPHY
IN THE NEWS
VOLUNTEER
EVENTS
HEADQUARTERS
MORE INFORMATION
CONTACT US
CONTRIBUTE

*First Name
Middle Name
*Last Name
*Address
*City
*State          Choose One ▼

*Zip Code
Daytime Telephone
Evening Telephone
Fax
Best Contact Time      Morning ▼

Best Contact Method    Daytime Telephone ▼

*Email Address
☑ I want to receive campaign updates via email

I want to:
☐ Work at my local campaign headquarters
☐ Organize in my neighborhood
☐ Write letters to the editor
☐ Email my friends to help the campaign
☐ Participate in on line events
☐ Help register voters
☐ Help organize on-line activists

Please tell us a little about yourself (optional):
☐ I have campaign experience
☐ I am a student
☐ I am a retiree
☐ I am a member of a labor union
☐ I am a registered Democrat
☐ I am a registered Republican
☐ I am a registered Independent
☐ I want information on registering to vote

Comments:

**Get Connected**
First Name
Last Name
E-mail

774

[ Volunteer! ]

## Privacy Notice

We will use your name and contact information only to contact you as you have indicated above. We will not sell or distribute your name in any fashion.

"Paid for and authorized by Friends of Keith Starrett. Copyright 2000. All rights reserved."

## Keith Starrett for Mississippi Supreme Court

<< HOMEPAGE

## More Information

You may contribute to Judge Keith Starrett's campaign online with a credit card by clicking on the CONTRIBUTE link, or you may contribute by check and mail your contribution to:

Friends of Keith Starrett
P.O. Box 32
McComb, MS 39649

DISCLOSURE:

Mississippi Code Annotated, Section 23-15-1021 limits individual and political action committee contributions to $5,000 per calendar year for the purpose of aiding any candidate for justice of the Mississippi Supreme Court.

Mississippi Code Annotated, Section 97-13-15 and 97-13-17 prevents any incorporated company or association from contributing any money in excess of $1,000 to any candidate per calendar year.

HOMEPAGE
BIOGRAPHY
IN THE NEWS
VOLUNTEER
EVENTS
HEADQUARTERS
MORE INFORMATION
CONTACT US
CONTRIBUTE

### Get Connected
First Name
Last Name
E-mail

"Paid for and authorized by Friends of Keith Starrett. Copyright 2000. All rights reserved."

# *Contribution Information*

Required Information

## Contributor Information

Title/*First/Middle/*Last/Suffix: [        ] [ ] [        ] [        ] [        ]

*Mailing Address:* [                    ]

Apt. Number (if applicable): [                    ]

City/*State/*Zip: [                    ] [    ] [ ] [        ]

*Email: [                    ]

☑ Please Add me to the E-mail list for Friends of Keith Starrett

*Your Employer: [                    ]

*Your Occupation: [                    ]

Home/Work Phone: [        ] [        ]

## Contribution Information

*Contribution Amount: $ [            ] . Minimum: $10

## Send a Message to Keith Starrett

[                                        ]

Enter Payment Information

Home

## LENORE L. PRATHER, CHIEF JUSTICE

### District 3, Place 2 (Northern) Term expires January 2001

Chief Justice Lenore L. Prather was born on September 17, 1931, in West Point, Clay County, Mississippi to Byron Herald and Hattie Hearn Loving. She graduated in 1949 from West Point High School. In 1953, she graduated from Mississippi University for Women and was selected for inclusion in Who's Who in American Colleges & Universities.

Chief Justice Prather graduated from the University of Mississippi School of Law in 1955 with a Juris Doctor degree. Following law school, she was in private practice from 1955 until 1971 practicing with her father and subsequently with her husband, Robert Brooks Prather. In 1965, she was appointed as Municipal Judge in West Point, Mississippi, and served as a Municipal Judge until September of 1971.

In 1971, Governor John Bell Williams appointed Chief Justice Prather as Chancery Judge for the 14th Chancery District which consists of Lowndes, Clay, Oktibbeha, Noxubee, Webster and Chickasaw Counties. She was the first woman to hold the Chancellorship in Mississippi. Following her appointment as Chancellor, she attended the National Judicial College in Reno, Nevada.

Governor William F. Winter appointed Chief Justice Prather to the Mississippi Supreme Court in 1982. She was the first female Justice for the State of Mississippi. Chief Justice Prather became a Presiding Justice in January of 1993 and Chief Justice in January 1998. During her tenure on the Supreme Court, she has received instruction in appellate matters at New York University.

Chief Justice Prather was inducted into the University of Mississippi Alumni Hall of Fame in 1986, and in 1995 she was selected as the Ole Miss Law Alumna of the Year. In 1990, she received the Medal of Excellence from Mississippi University for Women, and in 1993 was the recipient of the Alumni Achievement Award from Mississippi University for Women.

Chief Justice Prather is a member of The Mississippi Bar, The Mississippi Bar Foundation, the Conference of Mississippi Judges, the Charles Clark Chapter of the American Inns of Court, the American Bar Association and the American Judicature Society. She is also a member of Rotary International and is a Paul Harris Fellow. Additionally, Chief Justice Prather is a member of Junior Auxiliary, the Daughters of the American Revolution and is a former member of Pilot International. She has been included in Who's Who in America from 1984 through 1998. Chief Justice Prather resides in Columbus, Mississippi and is a communicant at St. Paul's Episcopal Church where she has served as a member of the Vestry.

Chief Justice Prather is the widow of Robert Brooks Prather. She has three daughters and two grandchildren.

nated number of *new lawsuits*
*filed since January 1st 2000.*

**Litigation Fairness Campai**
**Privacy Stateme**

## JUSTICE JAMES W. SMITH, JR. District 1 Place 3

Justice James W. Smith, Jr. was elected to the Mississippi Supreme Court effecti January 1, 1993. Justice Smith was born in Louisville, Winston County, Mississip October 28, 1948. He was reared in Pelahatchie and graduated from Pelahatchie School in 1961 where he was voted Mr. PHS and the Most Likely to Succeed. He attended Hinds Junior (Community) College and the University of Southern Missis where he received his B.S. in History and Political Science in 1965. In 1972, Justi Smith was awarded the Juris Doctorate from Jackson School of Law, Mississippi College, where he was also a member of the honorary law fraternity, Sigma Delta Kappa. In that same year, he was admitted to the practice of law in Mississippi. H earned a Master's degree in education administration from Mississippi College in

From 1969 to 1972, Justice Smith served as a teacher and principal at Pearl Juni High School. While at PJHS, he received the 1971 "Outstanding Young Educator Year Award" from Pearl Jaycees. Beginning in 1973 and continuing until 1980, he City Prosecuting Attorney for the City of Pearl and was also Rankin County Prosecuting Attorney in 1976. From 1977 to April, 1982 he served as district atior for the 20th Circuit Court District. From April of 1982 until his election to the Missi Supreme Court, he was County Court Judge for Rankin County.

Justice Smith formerly served three years in the United States Army and four yea the Army Reserve. He is an active member of V.F.W Post 11273 in Brandon and Jackson Downtown Rotary Club. Justice Smith received the 1991 Outstanding Po Role Model for Today's Youth Award, the 1992 Child Forever Award from Mississi Voices of Children and Youth for Service to Mississippi Children. He is the recipie the 1995 You've Made a Difference Award for Service to Youth. He is the recipien the 1996 Hinds Community College Alumnus of the Year Award. He is a Fellow of Mississippi Bar, and is the Court's representative on the Mississippi Bar Foundati Board of Governors, and the Mississippi Bar IOLTA Board. Justice Smith is a me of the Hinds, USM and Mississippi College Alumni Associations. He has been recognized numerous times in Who's Who in American Law and Who's Who in America in 1997.

Justice Smith is tree farmer and avid outdoorsman, well known for his contribution deer and wild turkey conservation projects. He is married to the Kathy Morris of S County. He has two daughters, Margaret Shannon Eaves of Jackson, and Amand Helen Smith who attends Elon College in the North Carolina. Kathy has two childr Katherine Murray and Samuel Murray. They reside in Andrew Chapel community Rankin County, Mississippi.

About LFC
Key Issues
Free Newsletter
Spread The Word
Contact Us
How Frivolous
Lawsuits Affect You
Contribute Now
Contact Your Elected
Official
Media
Links

 

Produced by *Bonner & Associates*,